**GEORGIA–PACIFIC CORPORATION,**
Plaintiff,

v.

**UNITED STATES PLYWOOD CORPO-
RATION, Defendant.**

United States District Court
S. D. New York.

June 15, 1965.

Fish, Richardson & Neave, New York City, for plaintiff; John Vaughan Groner, Ronald F. Ball and Roger R. Phillips, New York City, of counsel.

W. O. Heilman and Raymond T. Heilpern, New York City, for defendant; Sydney Krause, Raymond T. Heilpern, James Heilman and Joel Zweibel, New York City, of counsel.

HERLANDS, District Judge.

In this final phase of a patent infringement case, the issues now before the court relate to the determination of the amount of damages to be awarded to the successful defendant, United States Plywood Corporation (USP), against the plaintiff, Georgia-Pacific Corporation (GP).

The litigation in chief involved a United States patent known as Deskey Patent No. 2,286,068, the property of USP, and embodied in a striated plywood manufactured and sold by USP as "Weldtex". The infringing article is GP's striated plywood.

The crucial question to be decided is: What is the proper measure of USP's recovery under the applicable statute, 35 U.S.C. § 284 (1958), which calls for "damages adequate to compensate for the infringement"?

This action was commenced by GP for a declaratory judgment. USP interposed a counterclaim for patent infringement. These proceedings resulted, after appeal, in a decree holding that Claim 1 of the Deskey Patent was valid; that Claims 2 to 7 of such patent were invalid for lack of invention; and that GP had infringed Claim 1. Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958), reversing 148 F.Supp. 846 (S.D.N.Y. 1956).

The judgment on the mandate provided that USP recover of GP "the gains and profits made by the plaintiff and the damages sustained by the defendant by reason of such infringement."

The order of reference made March 17, 1959, referred the cause to a Special Master "to take testimony and make report thereon with respect to the profits and damages to which the defendant in this cause is entitled," together with findings of fact, conclusions of law and recommendations.

The Special Master properly construed the language of the judgment and of the order, under the applicable statute, as requiring him to report on the "damages adequate to compensate for the infringement." 35 U.S.C. § 284 (1958).

*Proceedings before the Special Master*

At the first meeting before the Special Master on April 2, 1959, USP applied orally for an order requiring GP to file an account of the profits derived from the sale of the infringing article. The Special Master directed that formal application be made, on papers and briefs. This was done. Oral argument was heard.

The Special Master ruled that an accounting for profits per se was no longer required by the statute (35 U.S.C. § 284) but that GP should file a statement which would supply the data from which its profits might be determined.

In so ruling, the Special Master held that, although an accounting for profits was no longer mandatory since the 1946 amendment (Act of Aug. 1, 1946, ch. 726, § 1, 60 Stat. 778), evidence of GP's profits should be adduced in connection with the determination of the "damages adequate to compensate for the infringement."

In compliance with a formal order of July 20, 1959 directing the filing of an account of GP's profits derived from the sale of the infringing article, GP filed a statement (referred to in the hearings before the Special Master as the "Final Report" and in this opinion as "GP's Final Report"). Thereafter, GP filed a revision of one of the exhibits (Ex. 9) contained in its said final report. The Special Master then commenced the taking of proof.

USP moved for an order of discovery of GP's books and records and for the examination of its officers, agents and employees as to the matters contained in GP's statement. The Special Master directed that GP's books and records be produced; that its officers, agents and employees be examined; and that a hearing for such purposes be held in Portland, Oregon, where GP's head office is situated.

Hearings were had in Portland, on six days in January, 1960. On January 14, 1960, the Special Master, all counsel, and other representatives of the parties journeyed to Olympia, Washington. There, at GP's plywood plants, the process of manufacture of striated plywood from inception to completion was observed.

The infringing article is striated plywood, described for purposes of this proceeding as "GP striated."

Following the Portland hearings, hearings were resumed in New York. At the close of USP's affirmative proof, USP filed a statement of its claim for damages (USP Ex. 116).

After both sides rested, briefs were directed to be submitted. USP's main brief was first filed; then GP's responding brief.

In GP's responding brief, GP contended that USP had failed to prove the fact of damage or to sustain the burden of proving apportionment, which burden GP contended rested on USP.

In view of the circumstance that GP's responding brief did not deal adequately with the issues of the fact of damage, apportionment and the burden of proof on the issue of apportionment, the Special Master reopened the hearings for the purpose of taking proof on the latter issue of apportionment. Such proof was taken.

Closing arguments were had on three days in June, 1961. The transcript before the Special Master is 3,999 pages; the exhibits are approximately 200 in number; printed briefs of counsel submitted to the Special Master cover 260 pages.

On December 1, 1961, the Special Master filed a 138-page report (referred to in this opinion as "the Report").

*Proceedings subsequent to the Special Master's Report*

The court has examined the Special Master's Report and the entire record before him.

In due course, pursuant to Fed.R.Civ.P. 53(e) (2), the parties filed objections to the Report; GP's were filed January 10, 1962, USP's on January 11, 1962. On April 21, 1964, the court heard an all-day argument on the objections.

Thereafter, on or about June 30, 1964, counsel filed memoranda discussing Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (June 8, 1964). The last communications from counsel on this subject were received by the court on March 5, 1965 (from USP) and March 12, 1965 (from GP).

*The Special Master's Services*

The Special Master, Emil Weitzner, Esq., of the New York Bar, is to be commended for the scholarly and meticulously thorough manner in which he has discharged his duties. Although the court differs with the learned Special Master with respect to the controlling measure of recovery, it cannot be said that the court's opinion is apodictic.

*Views of the Court of Appeals concerning the Deskey Patent*

The Deskey Patent (hereinafter sometimes referred to as "USP's patent") applies only to Douglas fir plywood. Douglas fir is a wood of soft texture. Deskey taught that deep incising or grooving or striating of the surface ply or veneer of Douglas fir plywood would mask checking of the surface ply and would also mask separation of the panels at the edges. The prior art had taught the esthetic advantage of superficial incising or grooving. Deskey conceived, invented and patented the method of deep striation to combine the effect of a pleasing appearance with the functional advantages referred to: concealing checks in the surface ply and masking edge effects.

The court of appeals held Deskey's invention novel, useful, and, therefore, patentable. The court of appeals described the subject of the patent, as follows (258 F.2d at 126–127):

The general subject matter of the patent is plywood panels, which consist of an odd number of thin plies of wood veneer with the grain in the adjacent plies crossed at right angles to each other. Since veneer is weak along the grain but relatively strong across the grain, the cross plies in plywood result in a wood product of considerable strength in relation to its weight and dimensions. The more inexpensive woods, however, such as Douglas fir, present a flat, wide-grained appearance with limited appeal for use by the public when

esthetic qualities are important. Further, the defendant claims that Douglas fir and like woods have two tendencies which militate against their use as decorative panels. The first is that the face ply has a tendency to expand and shrink under changing moisture conditions, resulting over a period of time in unsightly cracks between abutting panels. Also, defendant contends, because of the peculiar graining of these woods, changing moisture conditions will cause the face plies to check or open up surface cracks on the exposed panel. * * * [T]he Deskey patent is by its disclosures directed toward reducing edge effects and checking by grooving the face ply. The result is a striated panel with multiple and alternating ribs and grooves cut to a substantial depth in the face ply but not as deep as the glue line, across the entire panel and running the length of the face ply. By striating defendant contends that stresses created by the difference in moisture content on the surface and within the ply are localized within and across the ribs, thus reducing the incidence of checking and the tendency of abutting panels to draw away from each other.

The court found utility in the invention, saying (at 127–131):

[S]triation of wood products is old in the art. * * * Striating or grooving was also used at a prior time for decorative effect in the plywood field. * * *

In the light of prior art, it is clear that grooving wood and related products for decorative effect both by destroying the flat grained surface and masking joints was well known and that those skilled in the art were familiar with incising as a means of graining and incising and rupturing as a means of controlling warping. * * *

Basic to the Deskey patent is the fact that plywood panels covered by the claims are to be used where an

esthetically pleasing appearance is essential. * * * A pleasing surface appearance is accomplished by striation, which breaks up the grain, a fact long known to the art. Striation also serves to mask the line between abutting panels, and any gouging pattern obscures defects on the surface of the wood. It does not purport to have a significant effect on warp control. Indeed, unless the panel is balanced by such procedures as channeling the reverse face, as done by Georgia-Pacific, or using an initially thicker ply on the exposed face as taught by the Bailey patents, the striation increases the tendency of the entire panel to warp or curl. * * * [T]he Deskey striation attacks an old and very real problem in the Douglas fir plywood industry. * * *

That the Deskey striation was an effective solution cannot be denied. * * * Over a sixteen year period (1940–1956) the product has enjoyed an amazing success, with total sales in the United States exceeding $56,-000,000. Although it is undoubtedly true that the decorative appearance of Weldtex and the effectiveness of grooving in masking edge effects and checking have contributed toward this commercial success, we believe that the advantages stressed in the Deskey patent have played a significant role in the widespread and continued public acceptance of the product.

The court found novelty in the invention, saying (at 131–135):

[N]o one until Deskey realized that this decorative effect could be turned to a utilitarian advantage by cutting deeper into the surface of the plies. * * * [T]he Deskey striation has a very real utility which arises primarily from the deep grooving, a utility which was insubstantially present in the prior art and at most, if at all, only dimly perceived. * * * [T]his commercial success may in considerable

measure be due to the decorative appeal of Weldtex and the effectiveness of the striation in masking joints and checks. * * *

Deskey "recognized, attacked and successfully solved (the problems of checking and edge effect), achieving new, unobvious and unexpected results in a manner not suggested or disclosed to one skilled in the art. * * *" * * *

Only one of the claims is properly limited to the scope of the Deskey invention. That is claim 1. * * *

*USP's Alternative Claims for Damages*

USP stated its claim for damages alternatively (USP Ex. 116):

1. USP claimed $1,101,520, "representing the net profits United States Plywood Corp. would have earned had Georgia-Pacific Corp. not infringed." This claim is based upon the theory that USP "would have sold at least 80% of the total footage of striated sold by Georgia-Pacific," i. e., that USP would have sold that total of footage of "Weldtex", USP's striated plywood.

Further, USP claimed that these projected sales would have "convoyed" (i. e., generated) additional sales of other products yielding a projected profit of $410,188.40 on warehouse sales and $21,-221.69 on mill sales.

2. Alternatively, USP claimed $1,-004,735, the alleged net profits derived by GP from the infringing sales; and, further, that GP earned an additional profit of $431,000 on "convoyed" sales of other products. The latter claim on "convoyed" sales is stated in general terms. (USP Ex. 116; see Stenographic Minutes of the Hearings before the Special Master (hereinafter referred to as SM) 1168, 1509, 2692).

3. If neither of the foregoing alternative claims were allowed, USP claimed $974,953, the alleged difference between profits that GP earned on the sale of the infringing article and profits that GP would have earned had it sold an equal quantity of plywood panels known in the trade as "¼ inch AD".

USP further claimed interest and its expenses in this litigation.

*USP's Waiver of Damages Based on a Reasonable Royalty*

USP waived any claim for damages based upon a reasonable royalty (SM 3278–79). However, the Special Master properly invited and took proof offered by GP counsel on that subject (SM 3279–3364). The Special Master did so for the reason that, although a patentee in a patent infringement action may waive any right to recover damages based upon a reasonable royalty, the court is not foreclosed by such waiver from awarding damages so measured (the minimum standard fixed by section 284), if justice so requires.

USP's non-reliance upon a reasonable royalty as a measure of recovery has continued throughout these proceedings to date.

*This Court's Conclusion that a Reasonable Royalty Is the Proper Measure of Recovery Herein*

The measure of recovery adopted by the Report was all of GP's profits derived from the sale of the infringing article. However, the court concludes that, in the circumstances of this case, GP's profits did not constitute the proper measure of recovery and that the award to USP should have been and will be computed on the basis of a reasonable royalty. The reasons for the court's conclusion are set forth in this opinion.

Reference to plywood technology, trade terms, and the business activities of USP and GP in making and selling striated plywood is necessary for an understanding of the elements entering into the fixation of damages. The findings on those particular subjects in the Report are approved.

*"GP Striated": The Infringing Article*

The infringing article is a Douglas fir plywood panel four feet wide, eight feet long. It is composed of three parallel, contiguous veneers, assembled and bound or united by gluing and pressing, to form

a plywood panel. Each veneer is $\frac{1}{10}$ inch thick. The face veneer is striated, after the panel is bound. It is this striation which infringes.

The back veneer is gouged out to avoid warping of the panel. This is done under Leonardson Patent No. 2,782,468, which taught the art of gouging for that purpose. Leonardson was a GP employee.

The value of the panel before striation was much disputed on the issue of GP's profits.

A panel before striation is described as a "blank".

Blanks are made of three superimposed veneers: the face and back longitudinal, and the center or core lateral.

Veneers in the Douglas fir plywood industry are graded by letters "A", "B", "C", "D" and "N", according to industry standards known as the "Commercial Standard". "N" is the "cream of the crop"; and the veneers grade down from "A" through "D".

An issue contested before the Special Master was whether the face veneer of GP striated was Grade A (as contended by USP), or whether a higher value should be attributed to the blank because of superior quality of the face veneer (as contended by GP).

Where the face veneer is "A" grade and the back veneer "D" grade, the plywood panel is described as "AD". The grade of the center core or ply is not included in the trade description and is immaterial for purposes of this case.

USP contended that the blanks used by GP in the manufacture of GP striated were to be valued as $\frac{1}{4}$ inch AD blanks and at no higher value. GP contended that the blanks, being of superior grade, should be valued higher than the value of AD blanks.

Grade A is defined by the Commercial Standard as follows:

*Grade A* veneer shall be of one or more pieces of firm, smoothly cut veneer. When of more than one piece, the pieces shall be well joined.

The veneer shall be free from knots, open splits, pitch pockets, and other open defects. Pitch streaks averaging not more than $\frac{3}{8}$ in. in width and blending with color of wood, discolorations, sapwood, shims, and neatly made patches shall be admitted, but not more than 18 veneer patches shall occur in any 4 ft x 8 ft. A face, with proportionate limits for other sizes of panels. Shims may not be used over or around patches. Any multiple repair in a panel shall be limited to two patches. All patches and repairs must run parallel to the grain. However, approved plastic fillers may be used to fill small cracks or checks not more than $\frac{1}{32}$ in. wide; to fill small splits or openings up to $\frac{1}{16}$ in. wide, if not exceeding 2 in. in length and also to fill small chipped areas or openings not more than $\frac{1}{8}$ in. wide by $\frac{1}{4}$ in. long. This grade shall present a smooth surface suitable for painting.

Thus, a maximum of eighteen patches is allowed; and an unlimited number of shims; and one or more pieces of veneer well joined.

In the standard construction of $\frac{1}{4}$ inch AD plywood, the thickness of the panel before sanding is $\frac{5}{16}$ inch, or .293 of an inch. Assembly, gluing and pressing reduce the thickness by about .010 of an inch. After sanding, the thickness is reduced to about .250, subject to a tolerance of $\frac{1}{64}$ inch.

The panel before pressing and sanding (i. e., in the rough) is a $\frac{5}{16}$ inch thick panel. After sanding and pressing, it is a $\frac{1}{4}$ inch panel (i. e., within the meaning of the Commercial Standard). Both the face and the back of the panel are sanded after assembly, gluing and pressing.

*Some Technical Expressions and Procedures*

The following definitions are culled from the Commercial Standard:

Check.—A partial separation of veneer fibers, usually small and shallow, running parallel to the grain of the wood.

Heartwood.—The darker-colored wood occurring in the inner portion of the tree, sometimes referred to as "heart".

Knotholes.—Voids produced by the dropping of knots from the wood in which they were originally embedded.

Patches.—Insertions of boat-shaped sound wood glued and placed into panels from which defective portions have been removed.

Pitch Pocket.—A well-defined opening between rings of annual growth usually containing pitch.

Sapwood.—The lighter-colored wood occurring in the outer portion of the tree, sometimes referred to as "sap".

Shim.—A long, narrow repair not more than $\frac{3}{16}$ in. wide.

Veneer.—Thin sheets of wood.

Veneer Patches.—Patches inserted in veneer sheet before panel is assembled for pressing.

Patches are of two kinds: those inserted in the veneers before assembly and those inserted in the plywood blank after assembly. Patches in the veneers before assembly are of two kinds: Raimann and Skoog. The machine cuts out the imperfection in the veneer and inserts the patch. After the panel has been assembled, a patch known as the Davis patch is inserted.

The grading procedures for the manufacture of GP striated blanks at all of the plants where the blanks were manufactured (with one exception) provided:

Patches.—Only Raimann, Skoog elliptic and/or Davis patches. No glued patches. Total of three, one or mixed kinds allowed.

Shims.—$\frac{3}{16}$ in. at ends or $\frac{1}{8}$ in. away from ends. Must be selected for color and must be glued with urea or melamine resin.

Grading.—Any panels with small pitch pockets, conspicuously mismatched patches, discoloration, streaks, marks, glue stain or minor machining imperfections shall be classified as Paint Grade. All panels exceeding that grade shall be classified as Select. Panels below Paint Grade shall be classified as Rejects.

GP adduced testimony that the number of shims (unlimited in the specifications) was limited to two.

Patches and shims are described as "repairs" in the industry. The total number of patches and shims or other repairs in the face veneer of a panel are referred to as so many "repairs".

The $\frac{1}{4}$ inch AD blank is a staple product in the Douglas fir plywood industry. It has a wide market. The market prices are published and known. Its sale does not yield a substantial profit. If "upgraded," the possibility of a substantial profit is presented.

By "upgrading" is meant conversion of the staple into a specialty or premium product. The staple becomes a plywood distinguished for its relative uniqueness in construction and design, with particular reference to the face, which on application would be exposed to view. The manufacturing cost of conversion is relatively low. However, the price which the specialty commands is relatively high, thus creating a much larger margin of profit than would the staple $\frac{1}{4}$ inch AD panel. This explains GP's purpose in producing GP striated: to take a superior selection of $\frac{1}{4}$ inch AD blanks and "upgrade" them to decorative striated panels salable at a much higher price to yield a substantial profit.

*Construction and Manufacture of GP Striated Plywood (the Infringing Article) and of Weldtex (the Embodiment of the Patent)*

The striated product of USP, commercially known as Weldtex, was constructed of three plies of Douglas fir. Unlike the GP striated, which was constructed of veneers equal in thickness, each $\frac{1}{10}$ inch thick, Weldtex was constructed of three plies of different thickness: the face, $\frac{1}{8}$ inch thick, the back ply, $\frac{1}{16}$ inch thick, and the center ply

or core, ⅟₁₀ inch thick. This difference in thickness in Weldtex is purposeful. It results from the teaching of the Bailey patents: that veneers of different thickness solve the problem of warping.

The Leonardson patent (used in the manufacture of GP striated) sought to solve the problem of warping by gouging out the back ply of a panel of three veneers of identical thickness. The Bailey patents sought to solve the same problem by the invention of a panel composed of veneers of different thickness. Each in its own way produced a balanced panel, designed to compensate for the wood removed by striation from the face ply.

The specifications for the manufacture of Weldtex allowed five patches, shims, short tight splits, and small hand patches.

The process of manufacturing plywood may be described generally as follows: The veneers are first taken off the log. The log is unwound against a knife, rotary peeled, producing a single ply thickness of veneer. The veneer is clipped into different widths and then put through roller veneer dryers to remove the moisture. Grading and processing then begin. The wide sheets are classified and upgraded by patching. The narrow sheets are spliced and taped to become wide sheets to form a panel by gluing. Plywood results from the assembly and gluing of the veneers.

The following is a step-by-step description of the manufacturing process:

1. The bark is first removed from the log after the log has been cut to lengths usually eight feet long from log lengths ranging from sixteen to forty feet long. This is called "barking".

2. After barking, the log goes into the lathe and is rotated against a knife, cutting the required thickness of veneer.

3. The veneer is then stored in trays from which it passes into clippers (the veneer then being flat) and is clipped in widths usable later, defects (like rot) being clipped out. It is then piled in stacks on low factory trucks.

4. The veneer is then put into dryers, a single sheet at a time, to remove moisture.

5. At the outfeed end of the dryer, the veneer is graded, deposited on grading tables, and graded in accordance with the Commercial Standard.

6. Douglas fir plywood may be constructed of any odd number of plies, from three to thirteen. (We are concerned with a three-ply panel.) In each case, the adjacent sheet is at right angles, in order to provide strength against the grain to prevent the panel from splitting. The interior plies are called "cores" and the exterior "face" and "back".

7. Next is the process of assembly or lay-up, that is, of the veneers. The veneers are glued by means of a glue spreader, and assembled.

8. The assembly is then passed through a press where the panel is pressed tight at given temperatures and for given periods, depending upon the thickness of the assembly, to produce a bonded assembly or plywood.

9. After assembly, the veneers, being rough and unsanded, may be passed through sanders.

Blanks for GP striated and Weldtex were rough and unsanded because, in the case of GP striated, the face was striated and the back gouged; and in the case of USP's Weldtex, the face was striated and it was unnecessary to sand the back.

10. The final step is trimming of the panel, handpatching and inspection.

*The Infringement*

GP began to plan and prepare for the production of the infringing article in 1954.

The infringement actually commenced March 1955 and continued through September 1958.

The infringement was, as the Special Master found, deliberate and intentional. GP took a calculated risk. After study, patent counsel had advised GP that, in their opinion, the Deskey patent was invalid. They rendered a written opinion

**509**

expressing their professional judgment. The correspondence between GP officials and patent counsel discussed not only the legal questions but also practical questions relating to the kind of panel which GP could manufacture which would be least likely in any event to be held to infringe the Deskey patent.

USP makes no claim that GP's infringement was wilful within the purview of 35 U.S.C. § 284. It makes no claim for additional damages.

The infringement, though deliberate, was not tainted with unlawful purpose. GP relied, in good faith, on counsel's opinion which was upheld by the District Judge, though not sustained on appeal.

In considering the evidence of GP's costs in manufacturing its striated plywood (such evidence being pertinent to a determination of GP's profits), the Report kept in proper focus the deliberateness of GP's infringement. The Report correctly reasoned that, since litigation was inevitable and an adverse decree was an anticipated possibility,

> GP should be held to the maintenance of adequate records to sustain its contentions (in opposition to USP's specific claims) as to the various items of cost of manufacture, sale and distribution, making up its total cost on the basis of which its profits would be determined. [Report at 18.]

This responsibility of GP subsisted despite the circumstance that the burden of proof was upon USP to establish its claim for damages.

Consequently, the following formulation, as a guideline of analysis, expressed in the Report (at 18), is approved by the court:

> An infringer who deliberately risks infringement is required, at his peril, to maintain the records necessary to measure the liability which may ultimately be imposed, and on his failure to do so, all doubts are to be resolved against him. Computing Scale Co. v. Toledo Computing Scale Co., 279 F. 648 (7 Cir., 1921), cert. den. 257 U.S. 657 [42 S.Ct. 184, 66 L.Ed. 420]; Horvath v. McCord Radiator & Mfg. Co. et al., 100 F.2d 326 (6 Cir., 1938), cert. den. [Carrier Engineering Corp. v. Horvath] 308 U.S. 581 [60 S.Ct. 101, 84 L.Ed. 486]. To similar effect: National Rejectors, Inc. v. A. B. T. Mfg. Corp., 188 F.2d 706 (7 Cir., 1951); Oil Well Improvements Co. v. Acme Foundry & Machine Co., 31 F.2d 898 (8 Cir., 1929); Henry Hangar & Display Fixture Corporation of America, et al. v. Sel-O-Rak Corporation, 270 F.2d 635 (5 Cir., 1959); Krentler-Arnold Hinge Last Company v. Leman et al., 24 F.2d 423 (Dist.Ct. Mass., 1928).

*GP's Manufacture of Striated Plywood*

The following specific facts, recited in the Report (at 18–19), are amply supported by the evidence.

GP's principal plant was situated at Olympia, Washington. All blanks, wherever produced, were shipped to Olympia for striation. GP's blanks before striation were produced at Olympia and at other plants. These other plants fall into three categories:

1. "Outside" plants, over which GP had no control and in which GP had no stock interest. In this category were the Oregon plants of Snellstrom Lumber Plywood Co., Linnton Plywood Association and Multnomah Plywood Co.

2. Divisions and wholly owned subsidiaries of GP. In this category were plants at Bellingham (Washington) and Coquille (Oregon). Bellingham was a division of GP. Coquille was owned by Coos Bay Lumber Co., a wholly owned subsidiary of GP.

3. The plant of Springfield Plywood Corporation at Springfield, Oregon, an affiliate of GP. From March 1955 until September 1955, GP owned 69 percent of the capital stock of Springfield Plywood Corporation. In September 1955, its stock interest increased to 81 percent and continued so until the end of the infringing period.

A total of 15,899,000 sq. ft. of blanks for striation was produced by and for GP at all plants: 5,993,541 sq. ft. at Olympia; 2,140,618 sq. ft. at Bellingham; 906,304 sq. ft. at Coquille; 1,890,783 sq. ft. at Snellstrom; 110,624 sq. ft. at Linnton; 30,720 sq. ft. at Multnomah; and 4,826,310 sq. ft. at Springfield.

These amounts total 15,898,900 sq. ft. Both sides adopted a rounded off figure of 15,899,000 sq. ft.

Considering the production at Springfield as production by GP itself only to the extent of GP's stock interest in Springfield Plywood Corporation, the Report (at 19) finds the following:

Of the total of 15,899,000 sq. ft. produced, 2,994,009 sq. ft. were produced at "outside" plants; of the latter, 1,890,783 at Snellstrom, 110,624 at Linnton, 30,720 at Multnomah, and 961,882 at Springfield.

Thus, 2,994,000 sq. ft. of blanks were produced at "outside" plants and 12,905,000 sq. ft. at Olympia and divisions and subsidiaries of GP. If the Springfield production allocable to the minority stock interest be subtracted (since GP was in control), the net total produced at "outside" plants would be 2,032,118 sq. ft.

*GP's Distribution of Striated Plywood*

GP used three avenues of distribution: (1) sales to GP's warehouses; (2) sales to customers of GP's warehouses; and (3) sales to independent jobbers and others.

USP's Weldtex was distributed through two media: sales to its warehouses; and sales directly from the mill.

*USP and GP Were Not the Sole Suppliers of Decorative Plywood Panels*

The following findings and conclusions set forth in the Report and approved by the court are of fundamental importance:

1. In the relevant market of decorative plywood panels, neither USP nor GP had a monopoly; and USP and GP were not "the sole suppliers of a particular product" (Report at 100, 102–05);

2. While USP's product (Weldtex) and GP's striated plywood (the infringing article) were closely competitive (and so competitive to a greater degree than they were competitive with other decorative plywood panels) Weldtex was not unique as a decorative panel in the sense that one who wished to buy a decorative panel would buy either Weldtex or GP striated plywood, or none at all;

3. While one would be more likely, if he wanted a striated panel, to choose between Weldtex and GP striated plywood, he would not necessarily do so in the light of the availability of other decorative panels competitively priced;

4. It cannot be said that USP would supply the entire demand for striated plywood as exemplified by Weldtex, absent GP's infringement;

5. USP failed to established its alternative claim for damages based upon loss of profits on its projected loss of sales of Weldtex;

6. The proof is insufficient to support a finding that USP lost a measurable quantity of sales of Weldtex by reason of any competition on the part of GP in the sale of GP's striated plywood;

7. The proof is insufficient to support a finding that USP lost a measurable sum in profits due to any loss of sales of Weldtex by reason of any competition on the part of GP in the sale of GP's striated plywood;

8. The proof is insufficient to support a finding that, absent infringement by GP, USP would have manufactured and sold a measurable quantity of Weldtex additional to its actual production;

9. The proof is insufficient to support a finding that, absent infringement by GP, USP would have earned a measurable amount in profits resulting from the sale of any measurable quantity of Weldtex in the manner claimed by USP;

10. The proof is insufficient to support a finding that, absent infringement by GP, USP would have commenced the manufactuer of Weldtex at its Eugene plant, in September 1955;

11. The proof is insufficient to support a finding that contractors for USP would have manufactured any measurable quantity of Weldtex between and including September 1955 and September 1958, additional to the quantities of Weldtex which they did manufacture;

12. The proof is insufficient to support a finding that, absent infringement on the part of GP, USP would have manufactured any measurable quantity of Weldtex, at its Seattle plant, additional to quantities of Weldtex which it did manufacture there;

13. The proof is insufficient to support a finding that USP would have manufactured any measurable quantity of Weldtex at its plant in Eugene, Oregon, between September 1955 and September 1958;

14. There is no presumption of law that USP would have manufactured quantities of Weldtex equal to the quantities of striated plywood manufactured and sold by GP in infringing USP's Deskey patent;

15. There is no presumption of law that USP would have manufactured and sold any measurable percentage of the quantities of striated plywood manufactured and told by GP in infringing USP's Deskey patent;

16. There is no presumption of law that USP would have manufactured and sold quantities of Weldtex equal to 80 percent of the quantities of striated plywood manufactured and sold by GP in infringing USP's Deskey patent;

17. The proof does not support an inference or factual presumption that USP would have manufactured and sold any measurable quantity of Weldtex, absent infringement by GP, additional to the Weldtex manufactured by USP at its plant in Seattle, and by contractors manufacturing the same under contracts with USP, and at its plant in Eugene, Oregon.

18. USP and GP were in general competition with each other in the sale of plywood products, and, in particular, in the sale of Weldtex and GP striated plywood; and GP's purpose in planning and projecting and effecting the manufacture and sale of striated plywood was to put itself in direct competition with USP's Weldtex; and it carried out this purpose throughout the period of infringement;

19. USP and GP both made every effort (without succeeding everywhere) to extend their sales coverage to every possible corner of the country; and in some areas, the competition between them was closer than it was in others, but on the whole, it is clear that the competition between them was keen; and

20. It is impossible to say, with accuracy, what was the degree of competition, but there was substantial national competition between them, and GP striated plywood was competitive with USP's Weldtex to a greater degree than with other decorative panels.

*Rejection of USP's Alternative Claim Based on Alleged Loss of USP Profits Predicated on Projected Loss of USP Sales of Weldtex*

Although the court is cognizant of the onerous burden of proof placed on the owner of an infringed patented article, particularly where he must show as actual damages his own loss of sales or his own loss of profits, the court agrees with the Report that USP's factually unproved contentions—predicated upon USP's allegedly substantially identical amounts of GP sales or upon USP's allegedly measurable percentage (at least 80 percent) of amounts of GP's sales or upon USP's net profits allegedly calculated on GP's sales—are not permissible as a basis for an award of damages because such contentions, in the light of the record herein, fall outside the considerable latitude in speculation sometimes necessary in this type of case.

On the evidence, there is no basis in fact or law for USP's alternative claim for damages (USP Ex. 116) "representing the net profits United States Plywood Corp. would have earned had Georgia-Pacific Corp. not infringed."

■ The court sustains and approves all of the Report's findings and conclusions (Report at 91–107) leading to the rejection of USP's alternative claim for damages based upon alleged loss of USP's profits predicated on the projected loss of USP's sales of Weldtex.

*Rejection of USP's Alternative Claim Based on Certain Alleged Differences in Profits Actually Earned by GP and That Would Have Been Earned by GP under Certain Circumstances*

■ This third alternative claim by USP was properly dismissed (Report at 108) though the court's reason for so doing is based on other grounds, viz., that the proper measure of USP's recovery is a reasonable royalty.

## THE SPECIAL MASTER'S CRITICAL FINDINGS AND CONCLUSIONS THAT USP FAILED TO PROVE THE AMOUNT OF ITS ACTUAL DAMAGE, EITHER ACCURATELY OR APPROXIMATELY

Certain specific findings and conclusions of the Report, which the court hereby sustains and approves, are of controlling importance. They will now be discussed, though they are already encompassed within the court's approval, above, of the findings and conclusions set forth in the Report at pages 91 to 107 thereof.

*The Applicable Rule of the Law of Damages*

■ The Report properly states (at 94–95):

The line of demarcation, which rules of quality of proof required to sustain a claim for damages, is between the speculative and the probable. The reasonably predictable, not the conjectural, is the standard by which the proof must be appraised. In an early case, Seymour v. McCormick, 16 How. [480] 485 [14 L.Ed. 1024] (1853), the court said (p. 490):

"Actual damages must be actually proved, and cannot be assumed as a legal inference from any facts which amount not to actual proof of the fact. What a patentee 'would have made, if the infringer had not interfered with his rights,' is a question of fact and not 'a judgment of law.' The question is not what speculatively he may have lost, but what actually he did lose * * *"

See, also, Philp v. Nock [17 Wall. 460], 84 U.S. 460 [21 L.Ed. 679] (1873); Palmer v. Connecticut Railroad [Railway] and Light[ing] Co., 311 U.S. 544 [61 S.Ct. 379, 85 L.Ed. 336] (1941); Power Specialty Co. v. Connecticut Light & Power Co., 80 F.2d 874 ([2 Cir.] 1936); Underwood Typewriter Co. v. E. C. Stearns [&] Co., 227 F. 74 (2 Cir., 1915); Dobson v. Hartford Carpet Co., 114 U.S. 439 [5 S.Ct. 945, 29 L.Ed. 177] (1885); Dowagiac Manufacturing Company v. Minnesota Moline Plow Company, et al. (cited supra, p. 82).

Also, Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, p. 562, 51 S.Ct. 248, p. 250, 75 L.Ed. 544 (1931), where the court said:

"The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."

"In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate".

*The Finding of the Fact of Damage*

■ The Report (at 95) found, and that finding is sustained by the court, that USP proved "the *fact* of *harm*" or "the fact of harm or injury," i. e., "that

loss of sales of Weldtex occurred by reason of GP's infringement."

### The Finding and Conclusion that the Amount of USP's Damages Is Speculative and Conjectural

The Report (at 95) found and concluded, and that finding and conclusion are sustained by the court, that "the proof offered by USP of the amount of damages" was "speculative and conjectural"; that USP's "proof of the probability of production and sales in any measurable quantity is unsupported by sufficient or adequate evidence, and, in any case * * * is dependent upon a series of hypotheses which must be described as conjectural."

The Report (at 95–96) correctly stated:

> The fact of damage having been established, the amount need not be proved with mathematical accuracy or scientific precision, but may be approximated from evidence which would support such approximation. Such evidence is, however, lacking here. And it must be held that notwithstanding my finding that the fact of harm or injury has been proved, i. e., that loss of sales of Weldtex occurred by reason of GP's infringement, USP has failed to sustain the burden of proof of the amount of damages which it claims, or to supply proof from which the extent of its damages might be determined "as a matter of just and reasonable inference". (Story Parchment Co. v. Paterson Co., supra, at p. 562 [51 S.Ct. at p. 250]).

And also:

> In fine, USP's claim is predicated upon a series of hypotheses and estimates, which, as a matter of fact and of law, I find and conclude are conjectural and speculative, and do not measure up to the kind and quality of proof which would support a right to recover damages in any specific amount. [Report at 94.]

### Where Error Was Committed

Having correctly found and concluded that there was a failure of proof on USP's part to establish the amount of its damages, the Report then proceeded —and here is where error was committed—to use GP's profits as a measure of recovery as a matter of law. The proper course would have been to award a reasonable royalty.

## BASIS OF THE REPORT'S RECOMMENDATIONS: GENERALLY CONSIDERED

### The Recommendation in the Report

As noted earlier in this opinion, USP stated its claim for damages alternatively. One of these three alternatives— that USP should be awarded all of GP's net profits from the sales of GP striated plywood, the infringing article—was adopted and recommended by the Report (at 20) as the measure of recovery. The Report rejected USP's other alternative claims, and also rejected a reasonable royalty although USP did not submit a reasonable royalty as a fourth alternative.

Having adopted as the governing measure of damages all of GP's net profits from the sale of GP striated plywood, the Special Master held hearings to determine the pertinent figures and the applicable methods of cost accounting. The Report sets forth comprehensively all such data.

The Report found that GP's profits on the sale of the infringing article amounted to $685,837 (at 81); and the Report awarded that sum to USP as "the damages adequate to compensate" USP for GP's infringement (at 109), together with interest computed from December 1, 1961, the date of the filing of the Report (at 108).

### The Special Master's Rulings on the Admissibility of Evidence

The court sustains all of the Special Master's rulings on the various objections to the admissibility of evidence interposed in the course of the hearings. See, e. g., Report at 30.

*Reasonable Royalty: Preliminary Comments*

The court has concluded that none of the three alternative claims submitted by USP is a proper measure of recovery but that damages should be awarded on the basis of a reasonable royalty, as will be detailed in this opinion.

Although the Report did not base its recommendation to the court upon a reasonable royalty in any amount, the Report summarized the evidence on that subject "for completeness" as follows (Report at 27–28):

> Witnesses for GP testified, variously, that a reasonable royalty during the final four years of the Deskey patent, would be between one and two percent (Beggs, SM 3356), less than 3% (Elmendorf, SM 3304–5), 2½% if the net profit were 5% (J. L. Buckley, SM 2621).
>
> Mr. Heilpern, Secretary of USP, called as a witness by GP, testified that USP's licenses under the Deskey and Bailey patents, provided for a royalty of $3 per 1000 ft., a minimum of $1500 per year in two instances, and no minimum in another. These licenses were granted not to competitors, but to licensees who sold their entire production through USP or affiliates (SM 3280, 3279–90).

At the hearings before the Special Master, GP contended (SM 3816–7; 3825) "that profits are to be taken into account only to the extent of determining the amount of a reasonable royalty" (Report at 36).

*Further Proceedings*

In view of the magnitude and detail of a formal presentation of the accounting and other factors involved in ruling on the parties' objections to the Report with respect to the disputed items of GP's costs, the court has been impressed with the practical desirability of not only economizing judicial time but, more importantly, of expediting the filing of this decision which is dispositive of the fundamental issue. These considerations have persuasively suggested that the court should not now rule on the parties' objections to the Report in so far as they deal with the calculation of GP's profits.

Moreover, it would be premature at this time for the court to rule on the parties' objections to the Report with respect to the disputed item of GP's cost that determine the amount of GP's profits. It is not unlikely that the parties may agree upon a formula by which a reasonable royalty may be fixed. For example, the parties may stipulate that the royalty should be computed on the basis of a particular money amount per foot of striated plywood sold by GP or a certain percentage of GP's sales of that plywood or upon some other standard not requiring a determination of GP's net profits on its infringing sales.

However, should the parties be unable to agree upon such a formula or standard and should the court find that the amount of GP's net profits on its infringing sales is logically probative evidence on the issue of a reasonable royalty, the court would then find it necessary to rule on the parties' objections to the Report with respect to the disputed items of GP's costs.

We now consider the fundamental issue why a reasonable royalty is the applicable measure of USP's recovery.

## A REASONABLE ROYALTY IS THE PROPER MEASURE OF USP'S RECOVERY

*The Report's Decision and Rationale*

The Report adopted USP's view that the controlling statutory provision in 35 U.S.C. § 284—"damages adequate to compensate for the infringement"— should be interpreted to mean that all of GP's profits from its sales of the infringing article constitutes, as a matter of law, the measure of USP's damages.

These are the links in the chain of reasoning set forth in the Report leading to the Report's "square holding here that the profits of GP derived from the infringement may be taken as the measure of USP's damages, subject, of course, to a disposition of the issue of apportionment raised by GP" (Report at 39):

that the 1946 amendment (35 U.S.C. § 70; Act of August 1, 1946, ch. 726, § 1, 60 Stat. 778), which was rephrased without substantial change in the Act of 1952 (35 U.S.C. § 284; Act of July 19, 1952, ch. 950, § 1, 66 Stat. 813), did not eliminate "the infringer's profits as a measure of the patent holder's damages" (Report at 33) and "did not change the law of damages in patent causes as it had prevailed" since the enactment of the Act of July 8, 1870, ch. 230, §§ 55 and 59, 16 Stat. 206–207 (Report at 31);

that "the 1946 amendment * * * did not eliminate the substantive rule that the patent holder might recover as damages an amount equal to the profits which the infringer had derived from the infringement" (Report at 31–32);

that the infringer must be deemed to have "damaged the patent holder to the extent that the infringer profited from his wrong" (Report at 32);

that the infringer's profits in this case may be used "as an equation for the patentee's [USP's] loss or damage" (Report at 35);

that the Special Master's views are confirmed by the legislative history of the 1946 amendment (Report at 35–36), the language of the 1946 and 1952 amendments (Report at 36–37) and the decisions since 1946 (Report at 37–39).

The concatenation of premises and allegedly supporting authorities comprising the Report's rationale is flawed by errors, now to be discussed.

■ The distinction between "damage" and "damages" drawn in the Report (at 36–37), while recognized in the

law (Oleck, Damages To Persons And Property 16 (1961 rev. ed.); McCormick, Damages 2 n. 1 (1935)), does not carry significant weight in this case when measured against the revelatory legislative history. This court heeds the admonition that judges in construing legislation ought not to imprison themselves in the fortress of the dictionary.[1]

*General Critique of the Rationale of the Report*

The crux of the entire matter is the proper measuring-rod to be used in quantifying the patent owner's (USP's) damages.

Prior to 1946 there were four commonly accepted standards for determining the monetary recovery due to the owner of an infringed patent: an established royalty; a reasonable royalty; lost profits of the patent owner; and the profits of the infringer. The 1946 amendment [2] eliminated the pre-existing specific provisions for the recovery of the infringer's profits and this omission is contained in the 1952 codification,[3] the present law. It is generally agreed that the 1952 codification was not intended to alter substantively the 1946 provisions pertaining to the patent owner's recovery. Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 505 n. 20, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964). We are squarely faced with the issue as to the role, if any, which the infringer's profits are to play in the ascertainment of "[D]amages adequate to compensate [the patent owner] for the infringement."

The Report held, as already noted, that GP's infringing profits, to the full

---

1. We have been taught by Justice Holmes and Judge Learned Hand that a word is only "the skin of a living thought" [Towne v. Eisner, 245 U.S. 418, 425 [38 S.Ct. 158, 62 L.Ed. 372] (1918)] and that we must not make "a fortress out of the dictionary" [Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404 [66 S.Ct. 193, 90 L.Ed. 165] (1945)]. Justice Frankfurter has recently warned against making "of law too thin a dialectic enterprise" [National

Labor Relations Board v. Coca-Cola Bottling Co., 350 U.S. 264, 268 [76 S.Ct. 383, 100 L.Ed. 285 [(1956)].
In the Matter of Sleep Prod., Inc., 141 F. Supp. 463, 468 (S.D.N.Y.1956), aff'd sub nom., Local 140 Security Fund v. Hack, 242 F.2d 375 (2d Cir. 1957).

2. Act of August 1, 1946, ch. 726, § 1, 60 Stat. 778 (referred to in this opinion as "1946 amendment").

3. 66 Stat. 813 (1952), 35 U.S.C. § 284 (1958).

extent thereof, were the measure of USP's damages and that "in that respect, the 1946 amendment \* \* \* did not change the law of damages in patent causes as it had prevailed since the enactment of the Act of July 8, 1870." (Report at 31.) With this conclusion, the court disagrees.

█ In the court's opinion, the 1946 amendment was intended to, and did, eliminate the infringer's profits as an independently recoverable award, thus leaving compensatory damages, measured by the patent owner's lost profits or by a reasonable or established royalty, as the sole monetary recovery available to the patent owner. This statutory scheme is not to be evaded by verbal gymnastics which would allow a patent holder, who had not been deprived of any measurable quantity of sales or profits by the infringement, to recover as damages an amount equal to the infringer's profits.

> In patent nomenclature what the infringer makes is "profits," what the owner of the patent loses by such infringement is "damages." [Diamond Stone-Sawing Mach. Co. of New York v. Brown, 166 F. 306 (2d Cir. 1908), quoted with approval in Duplate Corp. v. Triplex Safety Glass Co., 298 U.S. 448, 451, 56 S.Ct. 792, 80 L.Ed. 1274 (1936).]

There is no necessary correlation between the amounts of their respective profits and losses.[4]

The Report (at 35) takes the position that the 1946 amendment was not intended to lessen the patentee's substantive right to the infringer's profits, and that both before and after the 1946 amendment the infringer's profits were "an equation for the patentee's loss or damage." However, this court's review of the successive statutes affording monetary relief to patentees, as set forth below, persuasively demonstrates that prior to 1946 "profits" was an independently recoverable award, separate and distinct from the patentee's damages and that the 1946 amendment should simply be construed as dropping "profits" as an independent measure of recovery. Further, it will be shown that, except in the infrequent class of cases touched on above (supra note 4) the amount of the infringer's profits is not an accurate gauge of the patentee's lost profits. Cf. Coupe v. Royer, 155 U.S. 565, 15 S.Ct. 199, 39 L.Ed. 263 (1895) (an action at law in which the Court held that damages were not to be measured by what the defendant had gained (out of the infringement) but by what the patent owner had lost).

*Review of the Successive Statutory Remedies*

The attempt to dogmatize the legislative purpose by resorting to an eclectic collection of phrases culled from the congressional hearings may turn into a quodlibet unless the entire record is read against the backdrop of prior statutes and judicial decisions.

In Birdsall v. Coolidge, 93 U.S. 64, 68–69, 23 L.Ed. 802 (1876), the Court provided some background on the early law pertaining to the patent owner's remedial rights.

> Controversies and cases arising under the patent laws are originally cognizable, as well in equity as at law, by the circuit courts, or by any district court having circuit powers. Prior to the passage of the act of the 8th of July, 1870, two remedies were open to the owner of a patent whose rights had been infringed, and he had his election between the two:

---

4. This is not to say that, in a proper factual context (*i.e.*, one in which it could be determined that a measurable quantity of the infringing sales would have been made by the patent owner if he had been untroubled by the infringer's competition), the amount of profits made by the infringer on these diverted sales might be probative of the patent owner's lost profits. See Manufacturing Co. v. Cowing, 105 U.S. 253, 26 L.Ed. 987 (1881). However, as already explained and as will be further elaborated, the facts of this case do not lend themselves to the application of this rule.

he might proceed in equity and recover the gains and profits which the infringer had made by the unlawful use of his invention, the infringer in such a suit being regarded as the trustee of the owner of the patent as respects such gains and profits; or the owner of the patent might sue at law, in which case he would be entitled to recover, as damages, compensation for the pecuniary injury he suffered by the infringement, without regard to the question whether the defendant had gained or lost by his unlawful acts, —the measure of damages in such case being not what the defendants had gained, but what the plaintiff had lost. * * *

As to the rationale behind the equity practice, the Supreme Court stated that:

The general rule [that the patent owner might recover the gains and profits that the infringer has realized from the use of his invention] has been sometimes said to be based upon the theory that the infringer is converted into a trustee for the owner of the patent, as regards the profits made by the use of his invention. But, as has been recently declared by this court, upon an elaborate review of the cases in this country and in England, it is more strictly accurate to say that a court of equity, which has acquired, upon some equitable ground, jurisdiction of a suit for the infringement of a patent, will not send the plaintiff to a court of law to recover damages, but will itself administer full relief, by awarding, as an equivalent or a substitute for legal damages, a compensation computed and measured by the same rule that courts of equity apply to the case of a trustee who has wrongfully used the trust property for his own advantage. Root v. Railway Co., 105 U.S. 189, 214, 215 [26 L.Ed. 975]. [Tilghman v. Proctor, 125 U.S. 136, 148, 8 S.Ct. 894, 900, 31 L.Ed. 664 (1888).]

The Act of 1870,[5] section 55, provided that, in an equity suit, the court could grant injunctions and that, upon rendering a decree for an infringement, the court might award to the claimant—"in addition to the profits to be accounted for by the defendant"—"the damages the complainant has sustained thereby." The court had the discretionary power "to increase" the amount assessed as the damages up to three times that amount.

Section 59 of the Act of 1870 provided for the recovery at law of "damages for the infringement of any patent" in an "action on the case." Where a verdict is found for the plaintiff, "the amount found by the verdict as the actual damages sustained" may or may not be the sum for which the court enters judgment, as the court had the discretionary power to enter judgment on the verdict for a sum not exceeding three times the amount of such verdict.

Thus, under the Act of 1870, equity was empowered to award damages as well as profits and an injunction. The patent owner who successfully litigated the issues of validity and infringement had a double-edged means of recovery available to him.

The dichotomy in the 1870 Act between "the profits to be accounted for by the defendant" and "the damages the complainant has sustained" by the infringement was sharply drawn in language and in consequences.

In section 55 of that Act, dealing with an equity suit, the court may increase up to three times the amount assessed as the complainant's damages. The court's power to triple the amount of the damages, as provided in section 55, is expressly governed by the cognate provision in section 59 which relates to the tripling of the amount of "the actual damages sustained." No such power was granted with respect to the amount ascertained to be the infringer's profits.

5. Act of July 8, 1870, ch. 230, §§ 55, 59, 16 Stat. 206, 207 (referred to in this opinion as the "Act of 1870").

A sharp cleavage was thus drawn between the infringer's profits and the actual damages sustained by the patentee.

In Birdsall v. Coolidge, supra, 93 U.S. at 69, the Supreme Court interpreted section 55 of the Act of 1870.

Damages of a compensatory character may also be allowed to the complainant suing in equity, in certain cases, where the gains and profits made by the respondent are clearly not sufficient to compensate the complainant for the injury sustained by the unlawful violation of the exclusive right secured to him by the patent. Gains and profits are still the proper measure of damages in equity suits, except in cases where the injury sustained by the infringement is plainly greater than the aggregate of what was made by the respondent; in which event the provision is, that the complainant "shall be entitled to recover, in addition to the profits to be accounted for by the respondent, the damages he has sustained thereby."

This reasoning strengthens the view that the infringer's "profits" were not an equation for the patentee's loss. This is made clear by the Court's emphasis on the disparity which may exist between the gains and profits made by the infringer, on the one hand, and the injury sustained by the patent owner, on the other.

The Court went on to discuss, at 69, the unsatisfactory situation, prevailing in the equity courts under the earlier patent law, which had led to the Act of 1870.

Cases occurred under the prior patent act where manifest injustice was done to the complainant in equity suits, by withholding from him a just compensation for the injury he sustained by the unlawful invasion of his exclusive rights, even when the final decree gave him all that the law allowed. Examples of the kind may be mentioned where the business of the infringer was so improvidently conducted that it did not yield any substantial profits, and cases where the products of the patented improvements were sold greatly below their just and market value, in order to compel the owner of the patent, his assignees and licensees, to abandon the manufacture of the patented product.

The Act of 1922,[6] section 8, provided that, in an equity suit, where the court rendered a decree for an infringement, the complainant was entitled to recover— "in addition to the profits to be accounted for by the defendant"—"the damages the complainant has sustained thereby."

The Act of 1922 made evidentiary amendments to the 1870 statute by dealing with the situation where the evidence shows that "the complainant has suffered damage from the infringement or that the defendant has realized profits therefrom to which the complainant is justly entitled, but that such damages or profits are not susceptible of calculation and determination with reasonable certainty." The 1922 Act dealt with this problem of proof by permitting the award of "a reasonable sum as profits or general damages for the infringement" (the dichotomy is explicitly preserved) and by permitting "opinion or expert testimony" to be received on the issue of the quantum of either profits or general damages. The court's power to treble the amount of the actual damages, as so determined, was continued.

The practical distinction between the infringer's profits and the patentee's actual damages was thus again recognized. Of significance to the case at bar (where the Special Master has found the fact that the patentee has suffered damage from the infringement but also found that the quantum of such damage has not been proven) is the provision that where either damages or the infringer's profits are not susceptible of calculation and determination "with reasonable certainty," opinion or expert testimony is competent

---

6. Act of February 18, 1922, ch. 58, § 8, 42 Stat. 392 (referred to in this opinion as the "1922 Act").

to prove the "reasonable" amount of either the damages or the profits.

A negative observation is in order: the 1922 statute did not provide that, where the complainant could not prove its actual damages, it could recover the infringer's profits as damages.

Congress was aware in 1922 and the years thereafter that a complainant who succeeded in proving infringement might have difficulty in proving the amount of damages (and, prior to 1946, the amount of the infringer's profits) "with reasonable certainty." To assist the complainant in such a strait, Congress enacted, in 1922, the provision that opinion evidence was admissible to prove "a reasonable sum as profits or general damages." In the 1946 amendment, that rule of evidence was broadened to permit the use of expert or opinion evidence "to determine * * * due compensation" (that is, "general damages") even if it did not first appear that such damages are not susceptible of calculation and determination with reasonable certainty. This evidentiary rule was carried into the 1952 act where expert testimony may be received "as an aid to the determination of damages" or a reasonable royalty.

Congress did not intend to aid a patentee in solving his problem of proving the quantum of his damages by enabling him to substitute the quantum of the infringer's profits for the quantum of the patentee's actual damages. For purposes of the law of damages, the two concepts are basically different; they cannot be treated as equivalent.

The fallacy in the Report's use of GP's infringer's profits as the measure of USP's damages is strikingly demonstrated by considering the trebling provision of the statutes. By force of that provision, the court has the discretion, exercisable under certain circumstances, to increase the amount found to be the damages up to three times the amount of the verdict or finding. The trebling provision in each of the statutes since 1870 applies only to actual damages and not to infringer's profits.[7]

Flying in the face of this, the Report treats GP's profits as USP's damages and would thus make it logically possible to triple GP's profits and to award them to the successful party in the guise of "damages." This result would be a far-reaching innovation, for none of the statutes permitted trebling of infringer's profits. It would be anomalous to achieve by indirection a result for which there was not the slightest discernible sanction.

By the Act of 1922 Congress continued the then existing phraseology by which the owner of an infringed patent could recover either an amount equal to the damages he had sustained or the defendant's profits.[8] Although the provision literally authorized a double recovery, judicial interpretation barred an award of both the amount of the infringer's profits and of the patentee's loss.[9]

Prior to the passage of the Act of 1922, the courts had developed the reasonable royalty as a measure of the patent owner's damages. Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398 (1915); United States Frumentum Co. v. Lauhoff, 216 F. 610 (6th Cir. 1914). The reasonable royalty was written into the 1922 statute, which empowered the court to "adjudge and decree the payment by the defendant to the complainant of a reasonable sum

---

7. See New England Fibre Blanket Co. v. Portland Telegram, 61 F.2d 648 (9th Cir. 1932), cert. denied, 289 U.S. 752, 53 S.Ct. 696, 77 L.Ed. 1497 (1933). The court quoted Yesbera v. Hardesty Mfg. Co., 166 F. 120, 128 (6th Cir. 1908), cert. denied, 214 U.S. 513, 29 S.Ct. 696, 53 L.Ed. 1063 (1909), to the effect that: "Since the statute permits only an increase of the damages found, and not of profits, it follows that the complain-

ant's motion in that regard falls to the ground." [61 F.2d at 651.]

8. [T]he complainant shall be entitled to recover, in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby * * *.

9. See, e. g., Birdsall v. Coolidge, 93 U.S. 64, 23 L.Ed. 802 (1876); Mathey v. United Shoe Mach. Corp., 54 F.Supp. 694 (D.Mass.1944).

as profits or general damages for the infringement."

It is clear from a reading of the Act of 1922 that, prior to the 1946 amendments, the phrase "damages" did not include the infringer's profits. "Damages" or "general damages" and "profits" were separate and distinct st..ndards of recovery.[10] Damages were awarded to the patent owner as compensation for the losses he had sustained as a result of the infringement, and were measured by either the patent owner's lost profits [11] or by royalties he would have received by licensing the infringer.[12] The patent owner was entitled to recover, by a bill in equity, the infringer's profits as an independent measure of recovery, which was awarded without regard to the patent owner's actual loss.[13]

The distinction between "damages" and "profits" prior to 1946 is underscored by the fact, already noted, that the courts considered themselves empowered by the then current statutory language to treble an award to the patentee based on his damages, but not one based on the infringer's profits. This differentiation refutes the Special Master's view that, even prior to the 1946 amendment, the infringer's profits was "an equation for the patentee's loss or damage." (Report at 35.)

If it be recognized that "profits" and "damages" were separate and distinct from one another prior to 1946, the Special Master's view that the infringer's profits is an equation for the patentee's loss can rest only on the theory that the two were equated by the 1946 amendment.

As previously noted, Congress, in the 1946 amendment, omitted all reference to the recovery of profits, providing merely that upon a judgment of infringement the complainant's recovery shall be—

> general damages which shall be due compensation for making, using, or selling the invention, not less than a reasonable royalty therefor * * *.

It does not seem plausible to argue that Congress sought by this amendment to expand the definition of damages, and to expand it so broadly as to incorporate within its folds what had thitherto been both historically and conceptually, a separate standard of recovery, i. e., the infringer's profits. Even if it be thought that such an expansive reading can be given to the term "general damages," how can it be given to the stark "damages" used in section 284 of the 1952 Act which, if anything, seems more narrowly circumscribed than the 1946 phrasing?

Furthermore, if effect is to be given to the plain wording of the statute, it is clear that "profits" can no longer be a separate and distinct item of recovery, awardable to the patentee regardless of the extent of his losses, as it was prior to 1946. In this sense, the Special Master notwithstanding, the statute manifestly lessens the patentee's rights to the infringer's profits.

Certain cognate action, taken by Congress in two specific respects in and after 1946, strengthens this court's conclusion that the 1946 amendment, relating to ordinary patents, was deliberately drafted with the purpose of eliding the infringer's profits as an independent measure of the patentee's recovery. That amendment is to be sharply contrasted with two other provisions. Section 35 of the Lanham Act,[14] enacted in 1946, relating to trademark infringement, provided

---

10. See "Measure of Damages in Patent Infringement Suits," 36 J.Pat.Off.Soc'y 317 (May, 1954).

11. See, e. g., Wallace & Tiernan Co. v. City of Syracuse, 45 F.2d 693 (2d Cir. 1930).

12. See, e. g., Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398 (1915).

13. See Tilghman v. Proctor, 125 U.S. 136, 8 S.Ct. 894, 31 L.Ed. 664 (1888).

14. Lanham Trade-Mark Act § 35, 60 Stat. 427, 439–440 (1946), 15 U.S.C. § 1117 (1958).

that the owner of a trademark should be entitled to recover

(1) *defendant's profits,* (2) any damages sustained by the plaintiff, and (3) the costs of the action.

[Emphasis added.]

Section 289 of the 1952 codification,[15] relating to design patents, provides that the owner of a design patent which has been infringed shall have, in addition to the other remedies available to the owner of an infringed patent, the recovery of the infringer's *"total profit,* but not less than $250." (Emphasis added.)

Thus, the conspicuous omission of any mention of "profits" with regard to ordinary patents in the 1946 amendment and in section 284 of the 1952 Act takes on heightened significance when compared to the specific provision for the recovery of profits in the prior patent statutes and the specific provision for the recovery of profits in section 35 of the Lanham Act (trademark infringement) and in section 289 of the 1952 codification (design patent infringement). The ineluctable inference is that Congress, in 1946, altered the traditional remedy available to the owner of an infringed ordinary patent.

The phrase "damages adequate to compensate for the infringement" in section 284 of the 1952 Act can mean nothing other than compensatory damages, *i. e.,* "an amount, though difficult to ascertain precisely, which indemnifies the plaintiff for the injury and damage suffered by him." Reynolds v. Pegler, 123 F.Supp. 36, 38 (S.D.N.Y.1954), aff'd, 223 F.2d 429 (2d Cir.), cert. denied, 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955).

"The award of compensatory damages for patent infringement is mandatory under the statute [§ 284 of 35 U.S.C.]" Laskowitz v. Marie Designer, 119 F. Supp. 541, 554 (S.D.Cal.1954).

The above conclusion is fortified by an understanding of why such a change was thought necessary. Since the 1952 codification was not intended to make substantive modifications in the provisions relating to recovery,[16] our inquiry focuses on the congressional intent in enacting the 1946 amendment.

This legislative history [17] is not entirely free of ambiguity.[18] However, it

---

15. 66 Stat. 813 (1952), 35 U.S.C. § 289 (1958).

16. See S.Rep. No. 1979, 82d Cong., 2d Sess. 9 (1952); Zinn, Commentary on New Title 35, U.S.Code "Patents", U.S. Code Cong. & Ad.News 2507, 2523 (1952).

17. Hearings on H.R. 5231 (later reported as H.R. 5311) Before the House Committee on Patents, 79th Cong., 2d Sess. (1946) (hereinafter referred to as the 1946 House Hearings); H.R.Rep. No. 1587, 79th Cong., 2d Sess. (1946); 92 Cong.Rec. 1857 (1946) (remarks of Rep. Lanham explaining the bill); S.Rep. No. 1503 (Cal. No. 1529), 79th Cong., 2d Sess. (1946); 92 Cong.Rec. 9187–88 (1946) (remarks of Sen. Pepper explaining the bill); U.S.Code Cong. & Ad. News 1386–87 (1946) (reprinting S.Rep. No. 1503).

18. E. g., compare 1946 House Hearings 9:
    MR. LANHAM. If * * * [the defendant] were infringing and if he were an innocent infringer, he would be

protected by the assessment of not more than reasonable royalties; is that correct?
    MR. C. HENRY. No, sir. General damages, not less than reasonable royalties, and an injunction.
with remarks of Rep. Lanham in the 1946 House Debate, 92 Cong.Rec. at 1857:
    This bill simply provides for proper damages with reference to infringement, and allows the court, in case the infringement of the patent is innocent, merely to assess royalties and restrain further infringement, and in case of willful infringement to provide what the damages shall be. * * * Of course, in a case of an innocent infringement, it is to be presumed that the court would assess no more than a reasonable royalty for such time as the patent was infringed by the innocent user.

See also the remarks of Mr. John Stedman, representing the Department of Justice, 1946 House Hearings 17:

is clear that Congress was dissatisfied with the existing law because the determination of the infringer's profits seemed necessary in virtually every case in which the patent owner sought a monetary award; and this resulted in long and costly hearings before masters and insoluble problems of apportionment.. Obviously, a determination of the infringer's profits was necessary in those cases in which the patent owner sought these profits as the basis of his recovery. However, Congress interpreted the 1922 Act as requiring an accounting for profits even in those cases in which the patent owner merely sought a reasonable royalty.[19] Thus, in enacting the 1946 amendment Congress intended at the very least to enable a patentee who sought a recovery based only on a reasonable royalty to avoid the time and money-consuming procedure of an accounting for profits. In other words, Congress eliminated any mandatory requirement that there be an accounting for profits.[20]

The Special Master maintains that this was all Congress intended to accomplish by the 1946 amendment.[21] However, his interpretation not only clashes with explicit statements in the legislative history,[22] but it leaves unsolved the major

---

MR. STEDMAN. In essence my view on the provision is this: The provision as it now stands, which reads "general damages which shall be due compensation for making, using, or selling the invention, not less than a reasonable royalty therefor" subjects the statute or the bill to the very objections which we are, in part, trying to get away from, namely, uncertainty as to what shall be the measure of damages. I think that in putting recovery on the basis of a reasonable royalty, the bill would achieve a fair compromise between the infringer and the owner of the patent and provide a measure which would not be subject to all sorts of varying court interpretations.

19. Remarks of Rep. Henry, 1946 House Hearings 4:

When the court enters a decree finding infringement, the practice is to make reference to a master to take an accounting for the profits derived from the infringement.

The inquiry that then ensues grows into a very intricate prolonged and expensive investigation * * *.

Testimony to show a reasonable royalty as a basis for granting damages does not become admissible until a showing is made that profits cannot be ascertained. * * *

The present bill eliminates an accounting for profits, and makes evidence at once admissible to show reasonable royalty as a basis for general damages.

Remarks of Sen. Pepper, 1946 Senate Debate, 92 Cong.Rec. at 9188:

[U]nder the present law, the court has to determine the profits which may have been made by the infringer, as well as compensatory damages.

20. See Remarks of Rep. Henry, supra note 19.

See Statement of Edwin B. H. Tower, Jr., representing the Legislative Committee of the Milwaukee Patent Bar Association, 1946 House Hearings 13:

MR. LANHAM. In point of time, to what extent would [protracted cases] * * * be obviated by the enactment of this bill?

MR. TOWER. I think, in the first place, it would be conducive to immediate settlement in the case, because you could go right in and show what would be a reasonable royalty.

21. Report at 31–32; see also Note, 72 Harv.L.Rev. 328, 345 n. 126 (1958):

"Profits" was dropped from the Act of Aug. 1, 1946 * * * not to eliminate infringer's profits as a measure of recovery, but to permit the patentee to bypass the frequently expensive and protracted procedure of an accounting for profits when he sought a recovery based on a reasonable royalty. * * * This view was adopted in the committee report, which stated that the "bill would not preclude the recovery of profits as an element of general damages * * *."

These views were somewhat tempered later on in the same note:

In 1946 the word "profits" was eliminated from the statute and the recovery of profits can now be justified only as one means of arriving at "damages." 72 Harv.L.Rev. at 349.

But see Note, Recovery in Patent Infringement Suits, 60 Colum.L.Rev. 840 (1960), for an excellent discussion of this issue.

22. Congressman Henry, the sponsor of the 1946 Act, opened the 1946 House Hear-

problems which motivated the 1946 legislation.

If the Special Master's theory were correct, the result would presumably be

ings (at 2–3) by reading a letter, dated January 4, 1929, between two members of the patent bar. Rep. Henry stated that this letter "rather completely outlines the problem":

"Mr. Huxley writes me that you on behalf of the American Bar Association are considering whether or not the recovery of the profits in patent cases should be eliminated and the successful patent owner be restricted to the recovery of damages which may or may not be increased in the discretion of the court.

For a long time I have been satisfied that the law should be changed in this regard."

*The letter writer further dilated on the reasoning behind his position:*

"As you know, in the old days patent cases were always tried at law before juries and the patent owner could only recover damages.

In view of the simplicity of the situation in those days this procedure was adequate; but it soon became evident that after all an injunction was the thing which the patent owner needed in order to secure adequate protection.

He could get this injunction only in courts of equity which had no power to award damages.

At first it was the established rule that there should be no injunction in a court of equity unless the patent had previously been sustained at law which meant a duplication of trials.

As conditions developed courts of equity proceeded to try cases first brought in the courts of equity and, to render the duplication of trials unnecessary, adopted the fiction that the infringer was a wrongful trustee and should be held to account for the profits he had made as such wrongful trustee, thus giving the patentee pecuniary redress in the equity court. The right to recover profits as well as damages in an equity case was finally fixed by statute.

This situation worked well enough under the simple conditions characterizing the administration of the patent law in the old days.

Now however it is a complete and absolute failure.

When the practice was established patents were almost always on simple things which were made and sold, and it was possible in such cases to determine the profits wrongfully made by the infringer.

Now, however, by far the greater number of patents that are in litigation are on special and often relatively insignificant parts of complex structures to which the patented feature is so related that it is absolutely impossible to apportion the profits due to the invention, those being the only profits to which the patentee is entitled.

The result is that there is a complete failure of justice in almost every case in which supposed profits are recovered or recoverable.

Absolutely artificial and unsound rules have been invented to solve the impossible problem of how to apportion profits.

The Supreme Court in the Westinghouse-Wagner case [Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222] made confusion worse confounded. The Court there dealt with a transformer which was permeated with the invention so that the structure as a whole could be considered as the thing upon which profits had been made by the infringer. The Court, having in mind the peculiar facts of the case, held that while the burden was on the plaintiff to apportion profits, if he did all that he could do to solve the problem and was utterly unable to apportion the profits, the burden shifted to the defendant, who was the wrong-doer, and if he was unable to apportion the profits due to the infringement, then the Court said the entire profits on the article were to be awarded.

The conclusion of the Court is utterly inapplicable to the majority of the important patent cases which, as I have said, relate for the most part to special and subsidiary features in a complicated structure.

In the Dowagiac case, the Supreme Court, undoubtedly recognizing that it had not cleared up the situation by the decision in the Westinghouse-Wagner case, introduced a thought that the Court might well determine what was a fair and reasonable compensation to the patentee, on general evidence. This, however, is a matter of damages rather than of profits.

the avoidance of some accountings for profits, but not a drastic reduction of such accountings because the patentee would still have the right to seek a de-

> Where, as in many cases, specific damages cannot be proved definitely, the patentee seeks a recovery of profits and at the present time, under the Westinghouse-Wagner doctrine, gets in very many cases enormously more than that to which he is really entitled.
>
> The only solution of the difficulty is to eliminate the recovery of profits which has been allowed purely because of a series of historical accidents.
>
> The only sound principle is to have the plaintiff recover the damages he can prove. This principle should be covered with the grant of power to the Court to increase the damages on the principle laid down in the Dowagiac case if those proved by the plaintiff seem to the Court inadequate.
>
> The situation seems to me absolutely hopeless and I do not think that anything could be accomplished by way of the needed reform."

See also S.Rep. No. 1503, 79th Cong., 2d Sess. 2 (1946), U.S.Code Cong. Service 1946, p. 1387:

The House Committee on Patents held hearings and made the following report, which is adopted as the report of the Senate Committee on Patents:

> "The bill H.R. 5311 is a committee substitute for H.R. 5231. Hearings were held on the latter bill on January 29, 1946. A number of persons appeared before the committee and testified—among them being representatives of the Patent Office, the Department of Justice, the American Manufacturers Association, the American Bar Association, and the Milwaukee Patent Law Association. In addition, other persons submitted written letters and statements. The substitute measure, H.R. 5311, incorporates many of the amendments proposed at the hearings.
>
> The object of the bill is to make the basis of recovery in patent-infringement suits general damages, that is, any damages the complainant can prove, not less than a reasonable royalty, together with interest from the time infringement occurred, rather than profits and damages.
>
> The relief that a patent owner needs against an infringer to protect his right in his patent and to compensate him for past infringement is an injunction to prevent future invasion of his right and general damages as due compensation for infringing either or any of the rights secured to the patent own-

er by his patent. Instead of general damages, section 4921 of the Revised Statutes now authorizes a complainant in whose favor a verdict has been rendered in an infringement suit to recover 'in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby.' The evil attendant upon 'the law's delay' and the difficulty of adducing convincing proof of necessary facts is peculiarly exemplified in patent-infringement suits where profits are claimed.

> Frequently a suit for patent infringement involves the infringement of only an improvement in a complex machine, and it is impossible to apportion profits due to the improvement. In such circumstances the proceedings before masters, which are conducted in accordance with highly technical rules and are always expensive, are often protracted for decades and in many cases result in complete failure of justice.
>
> Although the bill would not preclude the recovery of profits as an element of general damages, yet by making it unnecessary to have proceedings before masters and empowering equity courts to assess general damages irrespective of profits, the measure represents proposed legislation which in the judgment of the committee is long overdue."

By the second amendment the provision relating to attorney's fees is made discretionary with the court. It is not contemplated that the recovery of attorney's fees will become an ordinary thing in patent suits, but the discretion given the court in this respect, in addition to the present discretion to award triple damages, will discourage infringement of a patent by anyone thinking that all he would be required to pay if he loses the suit would be a royalty. The provision is also made general so as to enable the court to prevent a gross injustice to an alleged infringer.

The amendment at the end of the bill permits the pending causes mentioned to proceed under the old law.

It should be noted that, in the above-quoted passages, the strongest criticism of the pre-1946 system is reserved for those cases in which "profits", not a reasonable royalty, was sought. In other words, Congress's attention was primarily

termination of the amount of the infringer's profits and of his own damages, and to recover the greater of the two amounts. The patent owner's exercise of this right would entail another of those expensive and protracted hearings before a master, with the attendant problems of apportionment, which Congress clearly sought to eliminate.

Indeed, if the Special Master's construction were the correct one, the 1946 amendment granted to the patent owner the option of choosing whether or not to seek the ascertainment (and recovery) of the infringer's profits, and thus the power to necessitate proceedings before a master. This would be an ironic and implausible result in view of the impressive testimony before the House Committee on Patents that a serious defect of the then existing statute was the extent to which patentees were able to abuse their privilege of seeking a recovery of the infringer's profits, and to turn the proceedings before the master into an instrument for oppressing the infringer.[23] Merely eliminating the mandatory accounting for profits, which had thitherto preceded the setting of a reasonable royalty, would in no way have alleviated this problem, inasmuch as the patentees' abuses of the existing procedures stemmed from their privilege of choosing to recover the infringer's profits.

In the light of the grave concern expressed in the legislative history over the problems of apportionment of the in-

focused on the evils attendant on the recovery of "profits" rather than on the obstacle in the path of a patent owner seeking a reasonable royalty.

23. See, e. g., letter from Mr. Fish to Mr. Howson, supra note 22; statement of Mr. Conder C. Henry, Assistant Commissioner of Patents, before the House Committee on Patents, 1946 House Hearings 7–10:

Now, how has this present act been administered and what has been its effect on party litigants?

The relief that a patent owner needs against an infringer to protect his rights in his patent and to compensate him for past infringement is an injunction to prevent future invasion of his right and damages for past infringement. This the law now accords him in addition to the profits made by the infringer which are attributable to the unauthorized use and sale of the infringed invention. It is just at this point, that is, the determination of profits and damages and the manner of proving the same before masters, that difficulties and injustices arise in the adjudication of claims for patent infringements.

Frequently a suit for patent infringement involves the infringement of only an improvement in a complex machine, and it is impossible to apportion profits due to the improvement. In such circumstances the proceedings before masters, which are conducted in accordance with highly technical rules and are always expensive, are often protracted for decades and in many cases result in a complete failure of justice.

I fully agree with Judge Evan A. Evans, senior judge of the Seventh Circuit Court of Appeals, in his speech before the Patent Law Association in Pittsburgh, in 1944, when he said, that the rule holding an infringer liable as a wrongful trustee for the patent owner —is not workable or practicable and is used by plaintiffs and their counsel to beat and bludgeon a competitor until he, or it, be exterminated. It is not damages that are sought, but the extermination of a competitor.

By making it unnecessary to have proceedings before masters and eliminating the element of profits except as an element of general damages in patent infringement suits and empowering equity courts to assess general damages, the measure represents proposed legislation which in my judgment is long overdue.

The legislative history indicates that the most troublesome abuses of the then existing statute occurred when the infringement was of an improvement patent on a complex machine. However, as was already noted, Congress seems to have provided a sweeping resolution to the problem by eliminating the recovery of profits *qua* profits in all cases. The statute does not authorize a different remedy for the owner of an infringed item which was patented and sold as an entirety, or which provides the entire market value of the article of which it is a part, than it authorizes for the owner of an improvement patent.

fringer's profits [24] and the delay and expense [25] which arise during the ascertainment of profits, and in view of the specifically expressed purpose of attempting to eliminate such accountings,[26] it seems clear that the legislature had a more ambitious goal than the mere elimination of mandatory accountings for profits. This goal was the avoidance of all, or nearly all, accounting for profits before masters; [27] and it was to be accomplished by doing away with their basic *raison d' être*, i. e., by eliminating the infringer's profits as an independent measure of the patent owner's recovery.

Representative Lanham remarked in the House debates:

If the gentleman has examined the report, he will have noted that the object of the bill is to make the basis of recovery in patent-infringement

suits general damages; that is, any damages a complainant can prove, not less than a reasonable royalty, together with interest from the time the infringement occurred, *rather than damages based upon profits.* [92 Cong.Rec.1857 (1946) [E]mphasis added).]

Although the infringer's profits were no longer to be a distinct item of recovery, Congress apparently did not intend to relegate them to the limbo occupied by irrelevant and useless data. The House Report states that "the bill would not preclude the recovery of profits as an element of general damages." [28] This statement has undoubtedly tended to provoke the occasional unelaborated judicial declaration to the effect that the infringer's profits may be the measure of the patent owner's recovery.[29] This seem-

24. Supra note 23.

25. See, e. g., the Statement of Patent Commissioner Casper W. Ooms before the House Committee on Patents, 1946 House Hearings 14. In discussing the great duration of many patent cases, Comm'r Ooms stated that:

because of some obscurity in the applicable principles, which this statute will largely eliminate, and because of the emphasis in the statute as it is now written upon the availability of profits as a measure of damages, we have had these protracted accountings. * * *

I think it [protracted cases] is one of the sorest spots in the enforcement of the law in the United States. It should be rectified and this bill will do a great deal toward eliminating, I think, one of the most notorious cases of the denial of justice because of the delay of justice.

26. See the House Report, as adopted by the Senate Committee on Patents, supra note 22.

27. See the House Report, supra note 22. See also Statement of Asst. Comm'r of Patents Henry, 1946 House Hearings 7:

By making it unnecessary to have proceedings before masters and eliminating the element of profits except as an element of general damages in patent infringement suits and empowering equity courts to assess general dam-

ages, the measure represents proposed legislation which in my judgment is long overdue.

Mr. Henry noted, at page 10 of the 1946 House Hearings, that he was not one "who believes that this bill would prevent proceedings before masters where profits are claimed as an element of general damages."

28. H.R. Rep. No. 1587, 79th Cong., 2d Sess. 2 (1946). Sen. Pepper stated, in the 1946 Senate Debate, that:

the basis laid down by this bill is general compensatory damages which the plaintiff in the suit sustains. Of course, that may include profits, but it is not limited to profits * * *. [92 Cong. Rec. 9188 (1946).]

29. See, e. g., Hartford Nat'l Bank & Trust Co. v. E. F. Drew & Co., 188 F.Supp. 353, 359 (dictum), modified, 188 F.Supp. 347 (D.Del.1960), aff'd, 290 F.2d 589 (3d Cir.), cert. denied, 368 U.S. 825, 82 S.Ct. 45, 7 L.Ed.2d 29 (1961); 35 U.S.C. § 289 (1958), providing the remedy for infringement of a *design* patent, makes provision for the recovery of the infringer's profit, but after declaring that § 289 shall not lessen any other remedy which the owner has under Title 35, states that the patent owner "shall not twice recover the profit made from the infringement." It may be argued that this phraseology strengthens the view that, in some circumstances, profits are recoverable under § 284.

ingly random statement in the House Report poses a conundrum, inasmuch as the hazy legislative history attaching to the phrase "general damages" indicates that it was thought of as being nearly synonymous with "compensatory damages" and as a continuation of the provision for damages in the 1922 Act,[30] and thus a measure of recovery which was conceptually and historically distinct from "profits". The statute and its legislative history do not supply an explicit ex-

---

30. In testifying before the House Committee considering the bill Mr. C. Henry, Assistant Commissioner of Patents, stated:

> The author of the bill made the words "damages" and "compensation" almost synonymous—that the damages will be the compensation for infringing the rights inherent in the patent itself. That is what the bill is concerned with, in my judgment.

1946 House Hearings 11.
See also remarks of Sen. Pepper in the Senate Debate, 92 Cong.Rec. 9188 (1946):

> Mr. President, this is a House bill. It has the unanimous support of the Senate Committee on Patents, and also of the Commissioner of Patents. Essentially it only changes somewhat the basis of recovery in patent infringement suits.
>
> If Senators will examine the committee report, they will see in italics the new language which is proposed to be inserted. The essential change proposed is that the court may award general compensatory damages and lawyers' fees, where the court considers it proper to award lawyers' fees, whereas, under the present law, the court has to determine the profits which may have been made by the infringer, as well as compensatory damages. Except for changing the word "decree" to "judgment" in several places in the act, that is the only change which will be made.
>
> I believe the Senator from West Virginia [MR. REVERCOMB] made the objection. If any further explanation is desired, I shall be glad to try to give it.
>
> MR. REVERCOMB. Mr. President, will the Senator yield?
>
> MR. PEPPER. I yield.
>
> MR. REVERCOMB. I should like to ask for an explanation of House bill 5311 and House bill 5223, both of which deal with proposed changes in the patent law.
>
> MR. PEPPER. That is correct, and I was just explaining House bill 5311. I am afraid I did not make it clear to the Senator from West Virginia that there is carried in the committee report a statement of the change which is proposed to be made in the existing law.

> The measure is a House bill, and it has been reported unanimously by the Senate Committee on Patents, and is recommended by the Commissioner of Patents, Mr. Ooms.
>
> Let me state what the bill does: Under the present law, if a suit is maintained for the infringement of a patent, the measure of damages is the profit made by the alleged infringer, and also general compensatory damages which might have been suffered by the claimant.
>
> Experience has proven that it is such a difficult accounting matter to determine what the profit of the alleged infringer has been that there is almost always an interminable delay in connection with the recovery sought.
>
> Consequently, the basis laid down by this bill is general compensatory damages which the plaintiff in the suit sustains. Of course, that may include profits, but it is not limited to profits; and it is not necessary to prove profits, if the plaintiff does not find it appropriate to do so.
>
> The bill will also permit opinion and expert evidence to be received by the court. In addition, it awards to the court discretionary power to allow plaintiffs to recover attorneys' fees, if the court considers it proper to allow such recoveries.
>
> MR. REVERCOMB. Mr. President, do I correctly understand that the explanation the Senator has made covers all the changes which the bill proposes to make?
>
> MR. PEPPER. That is correct, except for the changing of the word "decree" to the word "judgment."
>
> MR. REVERCOMB. I withdraw my objection.
>
> THE PRESIDING OFFICER. Is there objection to the present consideration of the bill?
>
> There being no objection, the Senate proceeded to consider the bill (H.R. 5311) to amend Revised Statutes, 4921 (U.S.C.A., title 35, Patents, sec. 70), providing that damages be ascertained on the basis of compensation for infringement, which has been reported from the Committee on Patents with amendments.

planation of how "profits" were intended to function as an "element" of compensatory damages.

■ The phrase—"the recovery of profits as an element of general damages" —has been a persistent source of confusion. It is to be contrasted with the expression, "the recovery of profits as such." It can hardly be doubted that the 1946 and 1952 statutes abolished the recovery of the infringer's profits *as such,* in cases of infringement of ordinary patents.

What, then, is the proper sense and just application of the phrase, "the recovery of profits as an element of general damages"? It simply means that proof of the infringer's profits may, evidentially in particular circumstances, be probative of the patentee's damages or a reasonable royalty. The admissibility of the evidence of the infringer's profits would be governed by ordinary standards of relevancy in the context of the particular case.

This evidentiary proposition is a far cry from a rule that would, as a matter of substantive law, make the infringer's profits recoverable as "damages" through a process of word-play and fiction that first characterizes such infringer's profits as "unjust enrichment" or "constructive trust," then in effect orders "restitution" thereof, and then denominates the result as "damages". The net result is to treat the infringer's profits as ultimate, not evidentiary, facts by which to measure the patentee's recovery and thereby to enable the patentee to recover the infringer's profits as such—the very result sought to be obviated by the 1946 amendment.

USP has interpreted this fragment of legislative history—"the recovery of profits as an element of general damages" —as negativing any legislative intent to alter the modes of measuring the patent owner's recovery which were available prior to 1946.[31] According to the Special Master, the 1946 amendment permits the patent holder to "recover as damages an amount equal to the profits which the infringer had derived from the infringement." [32] In other words, the patent owner might still quantify his recovery by the amount of the infringer's profits, but instead of collecting this sum qua profits he would collect an equal amount of money as damages.

No matter what name the successful patent owner ultimately applies to his recovery (whether "profits" or "damages"), if it is to be measured by the amount of the infringer's profits, it would require the ascertainment of those profits. This in turn would necessitate an accounting for profits, whether before a master or before the court, which would be open to all the criticisms which were leveled at such proceedings in the testimony before the House Committee on Patents—the often insuperable problem of apportioning the infringer's total profits on the sale of a product between the patented and nonpatented features, the injustices sometimes visited on infringers on whom the burden of making the apportionment had fallen,[33] and the length and expense of the hearings.

An ambiguous statement in the legislative history of an act, injected *en passant,* should not result in the gross distortion of the statutory language and the defeat of the patent legislative purpose. Especially should this not be the case when a sounder theory exists by which the statement in issue may be reconciled with the plain meaning of the statute and the congressional intent.

■ It is the court's considered opinion that, under the 1946 amendment and section 284 of the 1952 Act, the patent owner's sole measure of recovery, other than a reasonable or established royalty,

---

31. USP's Reply Brief at 2–3.

32. Report at 32.

33. Note 23 supra. But see Cincinnati Car Co. v. New York Rapid Transit Corp.,

66 F.2d 592 (2d Cir. 1933). The Second and Sixth Circuits do not allow the owner of an infringed improvement patent to recover the infringer's entire profits, even though the patent owner shows that apportionment is impossible.

was to be *his* lost profits [34] resulting from the invasion of his patent right. In a case in which the patent owner is unable to establish, in the conventional way, the amount of his lost profits,[35] he would be relegated to the recovery of a reasonable royalty, unless he could utilize the amount of profits which accrued to the infringer as an *evidentiary factor* in ascertaining the amount of his own lost profits.

For example, if the patent owner can establish that he was in competition with the infringer in the sale of the patented article and that, absent the infringement, he would have made the infringer's sales of the patented item, but he finds it extremely difficult or impossible to prove what his, the patent owner's, profits would have been had *he* made these waylaid sales, then, the infringer's profits on these sales may logically (i. e., probatively) be used as a rough equation for the patent owner's lost profits. Accord, Manufacturing Co. v. Cowing, 105 U.S. 253, 26 L.Ed. 987 (1881).

If the patent owner can establish factually that he would have made a given percentage of the infringer's sales of the patented article, had he been untroubled by this illicit competition, then the infringer's profits on that same proportion of his sales bears a rational (i. e., probative) factual relationship to the amount of the patent owner's lost profits. Admittedly, in the hypothetical case, the infringer's profits on a given volume of sales may be only an approximation of what the patent owner might have earned on the same volume, inasmuch as their profit margins might differ. However, this mode of approximation will sometimes (as in the hypothetical case) provide a more satisfactory means of compensating the patent owner than would a reasonable royalty, because the reasonable royalty may not adequately indemnify the patent owner when the infringer was his competitor and, on balance, there is no hardship to the infringer, as he is deprived of nothing more than the benefit from his wrongdoing.[36]

The size of an infringer's profits is often an influential factor in the determination of the amount of a reasonable royalty. See Faulkner v. Gibbs, 199 F. 2d 635 (9th Cir. 1952); Hartford Nat'l Bank & Trust Co. v. E. F. Drew & Co., 188 F.Supp. 353 (D.Del.1960), aff'd, 290 F.2d 589 (3d Cir.), cert. denied, 368 U. S. 825, 82 S.Ct. 45, 7 L.Ed.2d 29 (1961). This is another way in which the infringer's profits may function factually as an evidentiary element of the patent owner's damages.

The interpretation which we have placed on section 284 of the 1952

---

34. The most common cause of lost profits is the diversion of sales to the infringer. However, lost profits may also stem from a reduction in the patent owner's selling price, which was necessitated by the infringer's competition. See Yale Lock Mfg. Co. v. Sargent, 117 U.S. 536, 6 S. Ct. 934, 29 L.Ed. 954 (1886).

35. The patentee establishes that absent the infringement he would have made a certain percentage of the infringer's sales, and he must show what his costs, and thus his profits, would have been on these additional sales. See, e. g., Livesay Window Co. v. Livesay Indus., 251 F.2d 469 (5th Cir. 1958); W. S. Godwin Co. v. International Steel Tie Co., 29 F.2d 476 (6th Cir. 1928).

36. Once this substitute method has been used to approximate the total profits which he has lost, the patent owner may be required, if the infringement was of a patent for an improvement on an article or of a patented feature sold together with unpatented parts, to apportion these total profits between those stemming from the patented features of the article and those attributable to the unpatented features. See Wallace & Tiernan Co. v. City of Syracuse, 45 F.2d 693 (2d Cir. 1930). But see Electric Pipe Line, Inc. v. Fluid Systems, Inc., 250 F.2d 697 (2d Cir. 1957) (alternative holding) (patentee's award included lost profits on unpatented features sold in conjunction with the infringed item). However, if the entire market value of the article is allocable to the patented feaure, the patent owner may recover as damages his total lost profits. Electric Pipe Line, Inc. v. Fluid Systems, Inc., supra (alternative holding).

Act ensures that, where relevant, in certain cases, the infringer's profits will be an evidentiary element in the factual determination of the patent owner's compensatory damages.

██ The question arises as to whether, in those cases in which the plaintiff seeks to utilize "profits" as we have suggested, this interpretation will perpetuate the problems that arose when "profits" were independently recoverable. However, the court concludes that this construction of section 284 of the 1952 Act will comply with the basic statutory purposes of effecting a sharp reduction in the number of proceedings before masters and avoiding the frequently insoluble problems of apportioning profits. These results will stem from the prerequisites that the patent owner must first establish, as a matter of evidence, the foundation fact that he would have made a measurable portion of the infringer's sales, if the infringer had not entered the field, before the amount of the infringer's profits on these sales becomes evidentially competent, material and relevant to the factual determination of the patent owner's lost profits.

This will not always be an easy hurdle for the patent owner to surmount. Indeed, USP was unable to clear it in this case (Report at 91–107). It will be particularly difficult for the patent owner to prove that the infringement diverted a measurable quantity of sales from him in those cases in which the infringement was of an improvement patent, or of a patented part sold in conjunction with non-patented parts—and these are just the classes of cases in which the apportionment of profits has proved such a source of concern.[37]

Although the profits made by an infringer are frequently taken into account in the fixing of a reasonable royalty, such profits are only one of many elements which are considered and, therefore, such profits need not be assessed with the same degree of exactitude that would be necessary if they were to function as the sole measure, as a matter of law, of the patent owner's monetary recovery. See Note, 60 Colum.L.Rev. 840, 857 n. 115 (1960). Compare Faulkner v. Gibbs, supra, with Hartford Nat'l Bank & Trust Co. v. E. F. Drew & Co., supra.

Consequently, when the infringer's profits are to be determined in order that they may serve as a factual guide in the setting of a reasonable royalty, there is no need for a protracted and complex accounting.

In rejecting USP's claim for damages based on its own lost profits, the Special Master pointed out that USP and GP were not the sole suppliers of a particular product, and that USP's Weldtex and GP's striated plywood were competitive with other decorative panels (Report at 100). The Special Master found the proof "insufficient to support a finding that USP lost a measurable quantity of sales of Weldtex by reason of any competition of GP in the sale of GP striated." In other words, the Special Master found, and in this the court concurs, that the proof was insufficient to establish that any particular percentage of GP's sales of the infringing article would have been made by USP in the absence of the infringement. Therefore, GP's profits on its striated plywood sales bear no rational evidentiary relationship to the amount of profits which USP lost as a result of GP's illegal intrusion in the market.

██ The Report therefore errs in awarding USP all of GP's profits from its sale of the infringing article despite the indubitable circumstance that, in point of fact and as explicitly found by the

---

37. See, e. g., Cincinnati Car Co. v. New York Rapid Transit Corp., supra note 33, 66 F.2d at 593:

> The situation was * * * one so common in patent accountings, in which the invention was not of the article as a whole, but of a small detail. The difficulty of allocating profits in such cases has plagued the courts from the outset, and will continue to do so, unless some formal and conventional rule is laid down, which is not likely. Properly, the question is in its nature unanswerable.

Special Master himself, those profits were not shown to have any evidentiary relationship to USP's actual loss or damage. To repeat: The Report (at 35) construes the statute as permitting the use of "the infringer's profits as an equation for the patentee's loss or damage." This, in the court's opinion, is fundamental error. To treat "profits" as the twin of "damages" in this case is to join "the ghostly company of legal fictions." Maitland, "English Law And The Renaissance" (1901), reprinted in Delany, The Frederic William Maitland Reader 227 (1957); see Hammond-Knowlton v. United States, 121 F.2d 192, 199–200 (2d Cir.) cert. denied, 314 U.S. 694, 62 S.Ct. 410, 86 L.Ed. 555 (1941) (a critique of fictions in the law).

The doctrine of unjust enrichment is most dramatically exemplified in those cases dealing with the misappropriation of inventive ideas and trade secrets; that is, cases of nonpatent torts. In this particular area, common-law principles control. Illustratively, the measure of damages has been either quantum meruit for the use value of the property (Strubbe v. Sonnenschein, 299 F.2d 185, 97 A.L.R.2d 1386 (2d Cir. 1962)) or the malefactor's profits (Franke v. Wiltschek, 209 F.2d 493 (2d Cir. 1953)). While the doctrine of unjust enrichment has an ethical appeal and harmonizes with the modern trend "of enforcing increasingly higher standards of fairness or commercial morality in trade," 3 Restatement, Torts 540 (1938), the case at bar is governed by a specific statute and not by general principles of the common law. The controlling effect of this statute is emphatically demonstrated by the meaningful legislative history of the statute which has been directly concerned with the measure of recovery.

*Case Law*

Until the pronouncement in Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964), no clear analysis of the role of the infringer's profits, under the 1946 amendment or section 284 of the 1952 Act, evolved from the judicial application of these provisions. Compare Zenith Radio Corp. v. Dictograph Prod. Co., 6 F.R.D. 597, 599 (D.Del.1947) with Binger v. Unger, 7 F.R.D. 121, 122 (S.D.N.Y. 1946), for two decisions which seem to lean in opposite directions in their interpretations of the 1946 amendment. Neither case presents any analysis of the issues. Nevertheless, while seemingly contrary authority does exist, certain cases, even before Aro, afford support for this court's restrictive view of the functions of the infringer's profits.

In Ric-Wil Co. v. E. B. Kaiser Co., 179 F.2d 401 (7th Cir.), cert. denied, 339 U. S. 958, 70 S.Ct. 981, 94 L.Ed. 1369 (1950), the court upheld the lower court's determination that the plaintiff's patents were valid and infringed. The defendants also appealed from that part of the district court's judgment which stated that they were to account for and pay to plaintiff their profits realized from the infringement and damages equaling the profits plaintiff would have made if it had had each of the defendant's infringing sales. The judgment directed, 179 F.2d at 407, that the cause be referred to a Special Master to take evidence and report " 'an account of profits and damages which Plaintiff has suffered'."

The court upheld the defendant's contention that the judgment conflicted with the 1946 amendment and ordered a modification of the provision relating to an accounting, stating, at 407, that:

> The provision in effect prior to August 1, 1946 provided for recovery by the complainant "in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby." The recent provision does not use the word "profits". It provides recovery for nothing other than "general damages". What elements may be included in such damages is not stated, except they "shall be due compensation". *The language appears to make it plain that profits realized by an infringer are not recoverable as such.* "General damages" is a broad term which no

doubt may include numerous elements depending upon the circumstances of the case. And whether an infringer's profits is an element of such damages depends upon the facts of each individual case. [Emphasis added.]

The Special Master construes the above language as mere dictum, and the case as holding only that the lower court's judgment under the 1946 amendment could not properly provide for an award of the infringer's profits and, in addition thereto, the patent owner's lost profits. The court disagrees with the Special Master as to the nature of the court's holding in Ric-Wil, as it is highly unlikely that the judgment and the reference to the master was intended by the lower court, or construed by the court of appeals, to permit an award to the plaintiff of the infringer's profits *plus* the plaintiff's lost profits. The language of the district court's judgment accorded with the phrasing of the 1870 and 1922 statutes, which worded the monetary recovery due the plaintiff in the conjunctive, but which were construed as barring a double recovery of the total amount of "profits" and "damages". The recovery was to be of a sum equal to the larger of these two amounts. See Birdsall v. Coolidge, 93 U.S. 64, 69, 23 L.Ed. 802 (1876); Mathey v. United Shoe Mach. Corp., 54 F.Supp. 694 (D.Mass. 1944).

It is scarcely likely that the lower court construed, or could have been thought to have construed, the 1946 amendment as permitting a double recovery to the patentee. Rather, it would appear that the district court had subscribed to the thesis now held by the Special Master herein—that the 1946 amendment was not intended to eliminate the infringer's profits as an alternate measure of the patent owner's recovery. Since the district court apparently thought that the 1946 amendment had not changed the mode of measuring the patentee's recovery, the judgment was phrased in a manner that would have been suitable under the pre-1946 provisions.

The language quoted from Ric-Wil indicates that the court of appeals was not troubled about the possibility of a double recovery, a possibility which had been precluded years before and was not even discussed in the opinion; rather, that court was concerned with the question of whether the 1946 amendment permitted the use of the infringer's profits as a measure of the patentee's award.

The court of appeals actually held that the 1946 amendment had changed the means of reckoning the patent owner's recovery; that the patent owner no longer could secure the infringer's profits as an independently recoverable award; that the question of whether the infringer's profits would be an element of general damages would depend on the facts of each individual case; and that the unspecified necessary facts, not having been shown in that case, the district court was unable to base the award on the infringer's profits.

The Seventh Circuit Court of Appeals did not elaborate in Ric-Wil on the circumstances or fact patterns which must exist in a given case in order that the infringer's profits might be an element of general damages. However, that same court went a long way toward filling this gap in the subsequent case of National Rejectors, Inc. v. A. B. T. Mfg. Corp., 188 F.2d 706 (7th Cir.), cert. denied, 342 U.S. 828, 72 S.Ct. 51, 96 L.Ed. 626 (1951).

In the latter case, it was established by factual proof that the defendant sold a total of 303,598 infringing devices and that, if the defendant had not infringed, the plaintiff would have made 233,590 of these sales. This finding was supported by the factual evidence that plaintiff had the equipment and capacity to fill the orders for the infringing sales and that, absent the infringement, the purchasers of the infringing devices would have bought from plaintiff. The court of appeals therefore upheld the finding of the lower court and the master that the infringer's profits from these 233,590 sales would have been realized by the patent owner if there had been no in-

fringing competition and the conclusion that such profits could be recovered by the patent owner as a proved element of his general damages.

The remaining 70,008 infringing units sold by the defendant did not, in fact, represent sales diverted from the patent owner; thus, he was allowed only a reasonable royalty on these sales rather than the infringer's profits.

This differentiation manifests a realization on the part of the Seventh Circuit Court of Appeals that profits qua profits are no longer recoverable as a separate measure of damages and that the infringer's profits are not to serve in every case as the measure of the damages suffered by the patent owner. For, absent a recognition of these two points, there would have been no reason to inject the standard of reasonable royalty into the picture—the patent owner would have been entitled to recover the infringer's profits, or an amount equal to the infringer's profits, on the sale of these 70,008 units.

The import of National Rejectors is not solely negative: the decision also indicates the circumstances in which the infringer's profits will function affirmatively as an element of the patent owner's general damages. Once the court had found as a fact that 233,590 of the defendant's infringing sales were diverted from the patent owner, the profits reaped by the defendant on this portion of his total infringing sales were used probatively as a factual equation for the patent owner's damages.

The Special Master has cited several cases construing the 1946 amendment as lending support to his view that the infringer's profits remained an independent measure of the patent owner's recovery. However, these cases not only fly in the face of the statutory language and purpose when given such a construction, but they are distinguishable on their facts from the instant case, as will be shown below.

The quotation of excerpts from a judicial opinion devoid of their factual con-text can best be compared to an attempt to appreciate a symphony by reading the program notes without hearing the music.

As background for Town v. Willis, 89 F.Supp. 437 (W.D.Mo.1950), it should be noted that the district court had originally found the plaintiff's patent, on a cushion for artificial dentures, valid and infringed by the defendant's device and that the court had enjoined the defendant from continuing to manufacture or sell an infringing product. 85 F.Supp. 483 (W.D.Mo.1949), aff'd, 182 F.2d 892 (8th Cir. 1950). Subsequently, the court held that the defendant violated the injunction, by manufacturing a device which was only colorably different from that protected by the patent. 89 F.Supp 437 (W.D.Mo.1950).

The court decreed—without any discussion or analysis of the 1946 amendment—that the plaintiff was entitled to the profits the defendant had made out of the manufacture of the device. 89 F. Supp. at 440. The decision does not disclose whether or not the defendant's infringement had diverted any measurable quantity of sales from the plaintiff or whether the court deemed the circumstances such that the defendant's total sales were diverted from the patent owner.

In Hayslip v. Textag Co., 98 F.Supp. 879 (N.D.Ga.1951), the defendant was found to have infringed on plaintiff's patent for a laundry identification system. The court entered an interlocutory decree enjoining further infringement by the defendant. Subsequently, the court held that the plaintiff was entitled to the profits derived by the defendant during the period of infringement. However, the case's precedential value is attenuated by its somewhat unusual aspects.

Prior to the period of infringement, the parties had had a temporary license agreement whereby the defendant was permitted to sell the patented items in return for the payment of a royalty on sales. The plaintiff terminated the li-

cense on March 16, 1950, at which time the period of infringement commenced; however, the defendants continued to tender royalty payments to the plaintiff, which he in turn paid into court. Upon the ascertainment of the infringer's profits it was determined that such profits were actually less than the royalties which had been paid into court. The district judge ruled that the plaintiff had elected to hold the defendants to profits earned and that the defendants were, therefore, entitled to a refund of the excess of royalties paid in over infringer's profits.

The opinion neither analyzes the 1946 amendment nor in any way seeks to explain away the provision of that statute which provided that on the rendering of a judgment of infringement, "the complainant shall be entitled to recover * * * not less than a reasonable royalty [for making, using or selling the invention]." In the face of such a windfall it is scarcely likely that the infringer would strenuously contest the court's adoption of "profits" as a standard of recovery.

In Hayslip v. Textag Co., 94 F.Supp. 425 (N.D.Ga.1950), aff'd, 192 F.2d 435 (5th Cir. 1951), the court held that the defendants had violated the injunction issued in the above-mentioned interlocutory decree, by continuing to infringe on plaintiff's patented laundry identification system, at a cost to plaintiff "of a great volume of sales," 94 F.Supp. at 427. The court, without any discussion of the 1946 amendment, awarded the patent owner "the profits made by defendant from the violation of the injunction." (Quotation from the court of appeals decision, 192 F.2d at 437.)

Both Hayslip v. Textag Co., 94 F. Supp. 425, and Town v. Willis, 89 F.Supp. 437, are distinguishable from the instant case, in that they involved an award of the profits which the infringer had made *by violating an injunction*. In such a case, even if a patent owner should be unable to prove his actual damages, it is arguable that it would be inimical to the sound administration of justice to rely

on a reasonable royalty or to measure the patent owner's monetary recovery by any standard which permitted the infringer to retain profits that he had made while in contempt of court.

For all that appears in either decision, it may have been due to the prompting of such desiderata, and in the exercise of their inherent equity powers, that these courts awarded the infringer's profits. See Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 52 S.Ct. 238, 76 L.Ed. 389 (1932). Such an interpretation would go far toward explaining the absence in both opinions of any discussion of the 1946 amendment and the changes, if any, it had effected in the measurement of the monetary recovery available to the owner of an infringed patent.

Faulkner v. Gibbs, 199 F.2d 635 (9th Cir. 1952), involved the infringement of a patent for a game device consisting of a bank of units resembling pin-ball machines. The Special Master quoted the following language from Faulkner v. Gibbs:

"The statutory provision governing this question [of the monetary recompense due the owner of an infringed patent] is [the 1946 amendment]. * * * *Save for the omission of any reference to profits as a basis of recovery in infringement cases [5] this provision makes no change in the long-settled law on the subject.*" [Report at 38.] [Italics are the Special Master's; parts in brackets are added by the court.]

Apparently the Special Master was of the opinion that this language supports his position. However, the court disagrees. On its face, the quoted passage scarcely seems to affirm the Special Master's point of view. Secondly, footnote 5 in the above quotation cites the reader to the discussion in Ric-Wil "of the effect of the omission from the statute of the word 'profits' as a measure of recovery * * *", (199 F.2d at 638, n. 5). This reference indicates that the court was not implying that the omission

of any reference to "profits" in the 1946 amendment was merely an altered verbalization of a substantively unchanged measure of recovery—which is apparently the inference drawn by the Special Master.

In addition, the two sentences in the Faulkner opinion which follow the above-quoted language make plain what the court meant when it said that (save for the absence of reference to "profits") "this provision makes no change in the long-settled law on the subject [of recovery in infringement cases]."

> The infringement of a patent is a tortious taking,[6] entitling the injured party to general damages, measured ordinarily by the fair value of what was taken, i. e., the privilege of making, using or selling the patented article.[7] [Note 7 states that, where the patentee has himself engaged in the use or sale of his patented article, such damages may also be measured by the patentee's lost profits.] Where an established royalty for a license is proved, this is the best measure of the value of what was taken by the infringement.[8]

It would seem that the court meant that the infringer's profits would no longer be independently recoverable and that the patent owner's general damages would continue to be measured by the fixing of a reasonable royalty, by existing established royalties and by the profits lost to the patent owner as a result of the infringement.

The salient fact is that the court in Faulkner never discussed the possibility of awarding the infringer's profits to the patent owner and actually affirmed an award to the patent owner of a reasonable royalty. This was the award although, from the opinion, it appeared probable that the infringer's profits exceeded the amount he was forced to pay as a reasonable royalty.

The Special Master also placed reliance on certain cases construing section 284 of the 1952 Act. However, Livesay Window Co. v. Livesay Indus., 251 F.2d 469 (5th Cir. 1958) lends no support to his position because it involved an award measured by the patent owner's own lost profits and not by the infringer's profits. Livesay involved the infringement of a patent for a monolithic window frame which had achieved great trade acceptance. The circumstances were such that, if the infringement had not occurred, the patentee's licensee would have made substantially all the infringer's sales. The court applied the licensee's net profit ratio, deduced from the licensee's experience on its own sales of window frames, to the total infringing sales, in order to reconstruct the profits which the licensee himself would have made, absent the infringement.

If the court had been unable to determine the licensee's margin of profit on its own sales of window frames, the court would have been forced either to abandon lost profits as the standard of the licensee's recovery or else to seek some other means of approximating the profits which would have been derived by the licensee from these additional sales. There is language in Livesay, at 471, intimating that that court might have used the infringer's profits on these sales as a rough measurement of the licensee's lost profits.

> Of course the question was how much had the Patent Holder and Licensee suffered by the infringement. And that question was primarily: had the Infringer not infringed, what would Patent Holder-Licensee have made? That in turn involved the amount of the business actually done by the Infringer which the Licensee would have performed had there been no infringement. Once the probable volume or proportion was ascertained, other incidental questions would arise as to the relative cost, gross and net profits and the extent to which the operating experience of one party could be applied to the other.

It is difficult to construe reasonably this language in a way other than that

the court has suggested. If the court accepted the view that an award of the infringer's profits was permissible under section 284 of the 1952 Act, either as an independently recoverable amount or as the measuring-rod for a sum denominated "damages", then the infringer's net profits on its total infringing sales would have been granted and it would have been irrelevant to determine "the amount of the business actually done by the infringer *which the Licensee would have performed had there been no infringement.*" (Emphasis added.) On the other hand, if the court, in the quoted paragraph, was merely discussing the traditional means of ascertaining the lost profits of the patent owner or licensee, then proof—that a given proportion of the infringer's business represented business that was diverted from the patent owner and that the patent owner would have had the capacity to handle this diverted business—would have been highly relevant. However, there would have been no point in ascertaining the extent to which the infringer's operating experience could be applied to the patent owner. Rather, the relevant factor would have been (as it actually was in the holding in Livesay) the patent owner's margin of profit on sales of the infringed article.

The quoted paragraph can be adequately explained if it is construed as the court has done. For, it is only if a court views the infringer's profits as a utility measure, to be brought in when the patentee's lost profits cannot be determined in the conventional way, that the court would find it necessary to ascertain both "the amount of the business actually done by the Infringer *which the Licensee would have performed had there been no infringement*" and "the extent to which the operating experience of one party [costs, gross and net profits] could be applied to the other." (Emphasis added.)

Both the Special Master and USP rely heavily on the decision of the Fifth Circuit Court of Appeals in Graham v. Jeoffroy Mfg., Inc., 253 F.2d 72, cert. denied, 358 U.S. 817, 79 S.Ct. 28, 3 L.Ed.2d 59 (1958). In Graham, the defendant's profits on the sale of infringing spring clamp plows were used as the measure of the patent owner's compensatory damages. The court stated, 253 F.2d at 74, that:

> The parties agree that compensatory damages, as provided for in the statute, may comprehend the profits of the infringer and lost sales and expenses of the patentee if proved, but that neither element of damage must in all events be found by the court. Evidence of each of these may be considered by the court in fixing its award. In other words, the profits made by the infringer from his improper use of the infringing device may be the measure of the damages suffered, even though the statute does not prescribe that profits are to be recovered as such.

While the quoted language may constitute a general rule of sorts, it is too ambiguous to permit of ready application. It is not clear whether the court meant that the infringer's profits might be used as an equation for compensatory damages in all cases in which such profits are provable or whether the language was only intended to indicate that, when certain additional circumstances are found to exist, the infringer's profits may be the measure of compensatory damages. If the court intended the latter formulation, it failed to limn the circumstances which must exist.

The court might have felt no necessity of further explication inasmuch as the *parties had agreed* on the infringer's profits as an appropriate measuring-rod for the patent owner's damages. Indeed, under the facts of the Graham case, there was some basis for such agreement because (at 77) there was no "real dispute that appellants [patent owners] would have sold substantially all of these plows but for the actions of the appellees."

When the evidence shows that an infringer's total sales of the infringing item have been diverted from the patent

owner, it is rationally permissible to find as a fact that the infringer's total profits on such sales would have accrued to the patent owner if he had not faced the infringer's illicit competition.

Graham v. Jeoffroy Mfg., Inc. has been cited for the proposition that:

> Profits of the infringer are evidence of the damages sustained by the holder of the patent and may be the measure of damages. [Henry Hanger & Display Fixture Corp. v. Sel-O-Rak Corp., 270 F.2d 635, 644 (5th Cir. 1959).]

However, whereas the patent owner in Graham would have had a monopoly on the sale of the patented device in the pertinent locale if he had not been troubled by the infringer, GP striated plywood and USP's Weldtex were not the only entries in the competition for a larger share of the decorative panel market. The Special Master was unable to find the percentage of GP's infringing sales which would have been made by USP's Weldtex if there had been no infringement.

Laskowitz v. Marie Designer, Inc., 119 F.Supp. 541 (S.D.Cal.1954), involved a *design* patent. However, the court referred, in a dictum at 554–555, to section 284 of the Act of 1952:

> The award of compensatory damages for patent infringement is mandatory under the statute. [35 U.S.C. § 284] * * * Whatever may have been the practice prior to the recent statutory amendments, the general damages *now* recoverable are the detriment suffered by the plaintiffs through the infringement. The profits of the infringer may be the measure, when no other is adequate. Whichever determinative method is used, the aim is to "compensate (the plaintiff) for the infringement", as the statute declares specifically. And when the profits or a reasonable royalty are chosen as a basis, there is no room for the award of other damages. In ascertaining damages, the object has always been to ap-

proximate, as nearly as possible, the *actual loss* suffered by the patentee. [Italics in original.]

It does not seem that, on this record, an award to USP of GP's total profits from infringing sales is a realistic effort to "approximate * * * the *actual loss* suffered" by USP. The Special Master was unable to make a finding as to the percentage of GP's total striated plywood sales which USP would have had for its Weldtex had there been no infringing competition from GP.

Assuming arguendo that, if GP had not violated the Deskey patent, USP would have made only a small percentage of these sales, then it would seem that GP's infringement did not deprive USP of very much in the way of profits. If such were the case, and GP's sales represented sales diverted from sellers of decorative plywood other than USP and/or derived from new markets opened up by GP itself, then GP's profits on its striated plywood sales would bear no rational (probative) relationship to USP's "actual loss." USP would be receiving a windfall out of all proportion to the "detriment suffered by [USP] * * * through the infringement." 119 F.Supp. at 555.

The facts in the present case are such that we cannot say with any degree of assurance that only a small percentage of GP's infringing sales, or for that matter any specific percentage, was diverted from USP. This, of course, is the point: it would be only by chance that an award of GP's infringing profits, or any arbitrarily selected portion of such profits, would approximate or coincide with USP's "actual loss."

There is some basis for believing that the court in Laskowitz appreciated this problem and realized that the infringer's profits were to be a subordinate measure of the patent owner's recovery. The court there stated, at 555: "The profits of the infringer may be the measure, [of the detriment suffered by the patent owner] when no other is adequate." This statement does not justify the awarding of the infringer's profits in circumstances

where, as in this case, there is no evidence that could support a finding that the infringer's profits even roughly approximated the patent owner's lost profits.

The court in Laskowitz joined the Ninth Circuit (see Faulkner v. Gibbs, supra, 199 F.2d 638 n. 5) in adopting the analysis of general damages put forth in Ric-Wil (quoted supra at 531). This adoption entails a recognition that "profits realized by an infringer are not recoverable as such" and that *one must look to the facts of each individual case before determining whether infringer's profits are an element of general damages*. (As already noted, Ric-Wil provides no enlightenment as to the circumstances which must exist before the infringer's profits may function as an element of general damages.)

If the Ric-Wil language is accepted as a proper statement of the law, it follows that there is a burden of proof —in each case in which it is proposed that the infringer's profits be an element in the computation of the patent owner's damages—to establish the foundation facts in that individual case making such a measuring-rod permissible.

However, the Special Master has not conceded that any state of facts might exist under which the infringer's profits would be impermissible as a measure of the monetary recovery due the patent owner. Thus, he has not felt it necessary to indicate the evidentiary circumstances, if any, present in the case at bar which probatively tend to make GP's "profits" a proper element in the computation of USP's compensatory damages.

Hartford Nat'l Bank & Trust Co. v. E. F. Drew & Co., 188 F.Supp. 353, as modified, 188 F.Supp. 347 (D.Del.1960), aff'd 290 F.2d 589 (3d Cir.), cert. denied, 368 U.S. 825, 82 S.Ct. 45, 7 L.Ed.2d 29 (1961), on which USP relies, involved the defendant's infringement of plaintiff's process patent for the improved production of synthetic vitamin $D_3$. The court originally found that the defendant's total sales of infringing products amounted to $3,580,824.63 and that the profits on these sales were $685,818.90. The patent owner contended that damages should be based on the defendant's profits. Instead, the court awarded *a reasonable royalty* of 10 percent of infringing sales, i. e., $358,082. Subsequently, the court's attention was directed to a stipulation of the parties that sales of products containing purchased vitamin $D_3$ should not have been included in the computation of damages. Thus, the damage award in the amount of $353,082 was reduced by $84,000. 188 F.Supp. 347, 349.

The defendant's profits were merely one of the factors considered in arriving at the reasonable royalty, the court's reasoning being that "a proper measure of damages includes a consideration of profits (not, however, a total award of the profits) * * *." 188 F.Supp. at 362. Thus, the holding of this case undercuts USP's insistence that it is entitled to a total award of GP's infringing profits.

However, in its brief, USP places emphasis on dicta in the opinion, quoting the court's statement, at 359, as follows:

Damages may be measured by the defendant's gain or the plaintiff's loss. Yet, no matter how measured, it can never be less than a reasonable royalty—and, there must be the factor of the infringer's profits to be considered as one of the elements of measurement. The factors selected by a Court for application must be determined in any particular case by the facts and circumstances involved, so, as a matter of fairness and equity the plaintiff receives his injunctive relief and sufficient compensation for the wrong done and, so, *defendant may not digest and retain, but must disgorge, his illegal gains*. [Emphasis added.]

The first sentence of the above language may appear to be troublesome. Some light is shed on the court's meaning by its paraphrase of and quotation from a dictum in International Indus. v. Warren Petroleum Corp., 248 F.2d 696, 699

(3d Cir. 1957), petition for cert. dismissed, 355 U.S. 943, 78 S.Ct. 529, 2 L.Ed.2d 523 (1958), that "damages [for patent infringement] are not what a plaintiff lost but rather 'the benefits, profits, or advantage gained by the defendant.'" 188 F.Supp. at 358.

We disagree with this flat statement because, "In patent nomenclature what the infringer *makes* is 'profits,' what the owner of the patent *loses* by such infringement is 'damages.'" Diamond Stone-Sawing Mach. Co. of New York v. Brown, 166 F. 306 (2d Cir. 1908) (emphasis added), quoted with approval in Duplate Corp. v. Triplex Safety Glass Co., 298 U.S. 448, at 451, 56 S.Ct. 792, 80 L.Ed. 1274 (1936).

The italicized clause in the last sentence of the quoted paragraph has a certain rhetorical appeal. However, it does not describe what the courts in fact do. In Hartford itself, the court found the defendant's infringing profits to be a sum well in excess of the amount ultimately awarded as a reasonable royalty. In fact, the very definition of a reasonable royalty assumes, that, after payment, the infringer will be left with a profit.

> A reasonable royalty is an amount which a person, desiring to use a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to use the patented article at a reasonable profit. [Faulkner v. Gibbs, supra, 199 F.2d at 639.]

Of course, it would be a different matter if the infringement was "wilful". In such a case the court has the power to treble the damages assessed against the defendant.[38]

The Special Master quotes extensively from Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 52 S.Ct. 238, 76

L.Ed. 389 (1932), to support his thesis that "the infringer must be held to have harmed, i. e., damaged the patent holder to the extent that the infringer profited from his wrong." Report at 32. That case was a contempt proceeding against the respondent, Krentler-Arnold, for violating a permanent injunction, against the manufacture or sale of hinged shoe lasts, that had been granted in an infringement suit. The district court found respondent guilty of "civil contempt" for deliberate violation of the injunction and awarded petitioners the respondent's profits from the violation.

The First Circuit Court of Appeals, 50 F.2d 699 (1931), rev'd, 284 U.S. 1448, 52 S.Ct. 238, 76 L.Ed. 389 (1932), agreed that the respondent had violated the injunction but held that profits could not be recovered, on the ground that in a civil contempt proceeding the relief should be based on the pecuniary injury which the contempt caused to the aggrieved party.

The Supreme Court agreed with the court of appeals to the extent that a civil contempt proceeding is for the purpose of compensating the injured party, but took a broader view of what might be included in a remedial award. In reversing the court of appeals and affirming the decree of the district court, the Supreme Court held that—in a proceeding for civil contempt for disobedience to an injunction granted in an infringement suit—the profits derived by the infringer from the violation of the injunction are recoverable by the patentee, even though the patentee was not able to prove any actual damages.

Certainly, Leman is sharply distinguishable on its facts from the instant case, involving as it did an equity proceeding for contempt of an injunction.

38. This, of course, emphasizes the deterrent aspect of the award. Since it is desirable to remove invalid patents from commerce in conjunction with our federal anti-monopoly policy, this deterrent aspect should not be overemphasized. · Absent fraud in the procurement, there is no procedure available to the government to challenge patents. Thus, overemphasis of the deterrent function of damages could well lead to a stultification of the only expedient method of testing the validity of a patent.

However, USP presses the argument that the *standard* for the aggrieved party's recovery in such a civil contempt proceeding was compensatory relief—*ergo* the same standard as applies under section 284 of the 1952 Act. Leman, a 1932 decision, was not predicated upon the pre-1946 statutory provision which specifically allowed a recovery of infringer's profits.

The Special Master reasoned: because Leman held, albeit in a different context, that the infringer's profits were included within the concept of compensatory relief, then *pari ratione* the infringer's profits must be included within the word "damages" as used in section 284 of the 1952 Act. This argument is not without some force. However, a pragmatic study of Leman cogently suggests that the Supreme Court's definition of compensatory relief in that contempt proceeding was prompted by factors not present in the case at bar.

In the district court, the patent owner had been unable to prove any damages, or, for some unexplained reason, to establish a reasonable royalty. See the opinion of the court of appeals, Krentler-Arnold Hinge Last Co. v. Leman, 50 F.2d 699, 711 (1st Cir. 1931), rev'd 284 U.S. 448, 52 S.Ct. 238, 76 L.Ed. 389 (1932). Furthermore, it appeared likely from the majority and dissenting opinions in the First Circuit Court of Appeals that the patent owner had no further means, either by action at law or bill in equity, by which he might secure a remedy. 50 F.2d 699, at 711–712. Thus, it would appear that the Supreme Court, sitting as an equity court, was faced with the alternative of awarding the infringer's profits as "a substitute for legal damages" or sending him away without any remedy.

The choice was made easier by the fact that equity had long before developed the fiction that an infringer could be held accountable for his profits, as a wrongful trustee. The purpose of this development was to enable equity to grant pecuniary redress to a patentee seeking an injunction, thus avoiding the necessity of sending him to a court of law in quest of damages. Leman presented an appealing situation for the extension of this doctrine, inasmuch as the alternative to an award of profits seemed to be not merely a duplication of trials but a complete failure of remedy.

However, "To call the infringer an agent or trustee is not to state a fact but merely to indicate a mode of approach and an imperfect analogy by which the wrongdoer will be made to hand over the proceeds of his wrong. Circumstances will affect the conclusion, including in them the knowledge and the conduct of the party charged." L. P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., 277 U.S. 97, 99–100, 48 S.Ct. 449, 72 L.Ed. 800 (1928) (Holmes, J.). While Leman may continue to control cases involving the violation of an injunction against patent infringement, see Hayslip v. Textag Co., 94 F.Supp. 425 (N.D.Ga.1950), aff'd 192 F.2d 435 (5th Cir. 1951) (but cf. National Drying Mach. Co. v. Ackoff, 245 F.2d 192, rehearing denied en banc, 245 F.2d 195 (3d Cir.), cert. denied, 355 U.S. 832, 78 S.Ct. 47, 2 L.Ed.2d 44 (1957)), the court believes that Congress intended to proscribe its "mode of approach," at least in patent infringement proceedings, such as these, which do not involve a civil contempt. See 35 U.S.C. § 284.

Even Leman conceded that "the distinction is clear between damages, in the sense of actual pecuniary loss, and profits * * *." 284 U.S. at 456, 52 S.Ct. at 241. In passing the 1946 amendment, Congress was intent on fixing actual pecuniary loss as the measure of recovery, and thus narrowing the range of relief available to the patentee.

There still is a strong public policy against allowing the victim of infringement to go remediless merely because he is unable to establish his actual pecuniary loss. However, in 1946, Congress expressed dissatisfaction with the granting of the infringer's profits as a "substitute" remedy. Congress chose to rely on the fixing of a reasonable royalty as a means

of ensuring that the patent owner would not be deprived of a remedy.[39]

A number of sharply differentiating factors distinguish Leman from the present case. As a civil contempt proceeding Leman was not governed by the statutory provisions of the patent laws. Secondly the primary interest to be vindicated in Leman was the public policy of effectuating compliance with the court's injunction and not simply compensation for a private wrong. Thirdly, an auxiliary sanction for the enforcement of the injunction was to deprive the wrongdoer of the profits he made as the direct result of his defiance of the court's order. Since remedial damages are an adjunct of civil contempt proceedings, the court quite understandably ordered the contemnor's profits to be turned over to the aggrieved party by treating such profits "as if" they were the latter's damages.

It is evident, therefore, that a civil contempt proceeding involves desiderata not present in a strictly private action governed and controlled by the directly applicable and express provisions of the patent laws—in this case, 35 U.S.C. § 284.

This court adopts, as a general philosophy of approach, the quotation in Power Authority of State of New York v. Federal Power Comm'n, 339 F.2d 269, 275 (2d Cir. 1964):

> We have in mind the trenchant warning of Walter Wheeler Cook:

> "The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against." "Substance" and "Procedure" in the Conflict of Laws, 42 Yale L.J. 333, 337 (1933).

In the present case, the court is not faced, as was the Supreme Court in Leman, with a suit in equity to be determined by general equitable principles. Rather, this court is bound to rule in conformance with the mandate of 35 U.S.C. § 284. In this court's view, Leman's precedential impact does not extend to the present case. This court adheres to the interpretation of section 284 of the Act of 1952 as previously explained.

The crucial issue in the present case—the measure of recovery under 35 U.S.C. § 284 and the related sharp distinction between the patent holder's (USP's) actual damages and the infringer's (GP's) profits—was squarely considered by the Supreme Court in Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964).[40] Whatever doubt may have

---

39. Both the 1946 Act and § 284 of the 1952 codification are explicit in assuring the owner of an infringed patent that his minimum recovery is a reasonable royalty.

40. Because Mr. Justice Brennan's opinion must be viewed in its surrounding factual ambiance, a summary of the pertinent facts is indispensable. The decision now discussed is referred to as "Aro II" to distinguish it from a prior decision, Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961), referred to as "Aro I". Aro I involved General Motors and owners of General Motors cars. Aro II involved Ford and owners of Ford cars.

Both Aro I and Aro II revolved around a combination patent covering a top-structure for convertible automobiles. The litigation grew out of the circumstance that the fabric in the top-structure wears out in several years and car-owner's desire to replace the worn-out fabric without ordering a new top-structure in its entirety.

The patent ("Mackie-Duluk") for the top-structure was originally held by Automobile Body Research Corporation (AB) which assigned all of its rights for Massachusetts to Convertible Top Replacement Co. Inc. (CTR).

Aro Manufacturing Co., Inc. (Aro) produced fabric components designed as replacements for worn-out fabric portions of convertible tops, specially tailored for

existed before Aro as to the proper resolution of that issue was completely dis-

pelled by Mr. Justice Brennan's opinion, extensive quotations from which, at 504–

installation in particular models of convertibles including 1952–1954 GM and Ford convertible automobiles. Aro was not licensed under the Mackie-Duluk patent.

Aro's role in both Aro I and Aro II was that of a contributory infringer in contrast to GM and Ford who were direct infringers. Since there could be no contributory infringement without there first being direct infringement, the jural relations between CTR and AB, on the one hand, and GM and Ford, on the other hand, had to be explored.

AB had entered into a license agreement with General Motors who used the patented structures in its 1952–1954 convertibles on the basis of a 5 percent royalty to AB for the right to make and sell the patented top-structures. In Aro I (an action brought by CTR in 1963 to enjoin infringement and contributory infringement and to obtain an accounting, with respect to fabrics sold by Aro for use in GM and Ford cars embodying the patented structures), the Supreme Court reversed an interlocutory judgment for CTR. This reversal dealt only with GM, not Ford, cars. The Supreme Court held in Aro I that the replacement of the fabric portions of the GM convertible tops constituted permissible repair of the patented combinations and not a contributory infringement reconstruction, where the replacement was made in a structure whose original manufacture and sale had been licensed by AB and CTR, as was true only of the GM cars.

In Aro I, the Supreme Court also ruled that CTR and AB could not validly license Aro with regard to its sales of replacement fabrics to GM car owners because such a license would constitute an improper extension of AB's and CTR's patent monopoly to unpatented elements (replacement-fabrics) used as repairs.

The holdings in Aro I served as controlling background to the patent law issues decided in Aro II.

Aro II involved Ford, which had infringed the patent in the period 1952–1954. The Supreme Court held that, when the structure was unlicensed (as was true of Ford cars in 1952–1954), car owners, by replacing the worn-out fabric element of the patented top-structures, committed direct infringement; and that Aro committed contributory infringement (under 35 U.S.C. § 271(c)) by supplying the infringing car owners with replacement fabrics specially designed to be utilized in such infringing repair.

On July 21, 1955, Ford entered into a releasing and licensing agreement with AB whereby Ford agreed to pay AB $73,000 for certain rights under the patent and to pay a 5 percent royalty on replacement tops; and it was further agreed that Ford car owners could use the patented top-structures from and after July 21, 1955.

The Court, considering the effect of the July 21, 1955 agreement on Aro's liability for contributory infringement, held that Aro was liable only in respect of replacements made on Ford cars before July 21, 1955. After that date, Ford car owners had authority (a license) from AB (the patentee) to repair the patented structures. Since Ford car owners, after July 21, 1955, did not commit direct infringement by making replacement repairs, Aro did not commit contributory infringement in selling them replacement-fabrics for this purpose. Thus, as to sales of replacement-fabrics after July 21, 1955, there was no infringing use for which the patentee was entitled to compensation from Aro. As to sales made before July 21, 1955, Aro was liable: the July 21, 1955 agreement did not erase the past contributory infringement by Aro, subject to the reservation that (under the "knowingly" provision of § 271(c)) CTR must prove (as a precondition to Aro's being liable) that Aro knew that the combination (Ford convertible tops) for which Aro's component (replacement-fabric) was specially designed was both patented (by Mackie-Duluk) and infringing (by Ford).

The case was remanded to the district court "for a determination of damages" (377 U.S. at 502, 84 S.Ct. at 1540).

Part IV of Mr. Justice Brennan's opinion dealt with "the measure and total amount of recovery to which CTR and AB are entitled" (at 503, 84 S.Ct. at 1541). The Court discussed the measure of recovery for patent infringement under 35 U.S.C. § 284 (at 504–513, 84 S.Ct. at 1541–1546).

Generally stated, the steps in the Court's reasoning were these: (1) That a patentee may not recover the infringer's profits under 35 U.S.C. § 284; only the patentee's own actual damages are recoverable. (2) The patent holder (CTR) may not recover a royalty based on Aro's sales, as a contributory infringer, because CTR was not lawfully deprived of a royalty by Aro's contributory infringement, for the reason that CTR could not have validly licensed Aro's

512, 84 S.Ct. at 1541 now follow, with emphasis supplied:

The measure of recovery for patent infringement is governed by 35 U.S.C. § 284, which provides:

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

"When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed."

It is presumably the language "in no event less than a reasonable royalty" that has led to the assumption noted above. But that assumption ignores the fact—clear from the language, the legislative history, and the prior law—that the statute allows the award of a reasonable royalty, or of any other recovery, only if such amount constitutes "damages" for the infringement. It also ignores the *important distinction between "damages" and "profits," and the relevance of this distinction to the 1946 amendment of the statute.*

*"In patent nomenclature what the infringer makes is 'profits'; what the owner of the patent loses by such infringement is 'damages.'"* Duplate Corp. v. Triplex Safety Glass Co., 298 U.S. 448, 451, 56 S.Ct. 792, 793, 80 L.Ed. 1274. Profits and damages have traditionally been all-inclusive as the two basic elements of recovery. Prior to 1946, the statutory precursor of the present § 284 allowed recovery of both amounts, reading as follows:

"[U]pon a decree being rendered in any such case for an infringement the complainant shall be entitled to recover, in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby * * *." R.S. § 4921, as amended, 42 Stat. 392.

*By the 1946 amendment, Act of August 1, 1946, c. 726, § 1, 60 Stat. 778, 35 U.S.C. (1946 ed.), §§ 67, 70, the statute was changed to approximately its present form, whereby only "damages" are recoverable. The purpose of the change was precisely to eliminate the recovery of profits as such and allow recovery of damages only.*

"The object of the bill is to make the basis of recovery in patent-infringement suits general damages, that is, any damages the complainant can prove, not less than a reasonable royalty, together with interest from the time in-

sales to Ford car owners as CTR was denied the right to license sales of Aro's replacement-fabrics to GM car owners by the decision in Aro I.

The Court's inquiry, as the excerpts from its opinion quoted in the text herein shows, was directed ultimately to determining "actual" damages suffered by CTR and AB, i. e., "whether CTR and AB suffered any loss by Aro's infringement," "how much * * * [they] would have made if Aro had not infringed" (at 509, 507, 84 S.Ct. at 1544, 1543)—*without* regard to the question whether Aro profited by its acts.

On the issue of the measure of recovery, with which this court is concerned, Mr. Justice Brennan was joined

by Mr. Justices Stewart, Goldberg and White. They regarded the issue as so important—in light of the erroneous assumption as to that subject entertained by all parties (at 504, 84 S.Ct. at 1541) and the practical desirability of avoiding a remand (at 502, 84 S.Ct. at 1540) in the event that the lower courts should adopt an incorrect criterion of damages —that Mr. Justice Brennan wrote at length despite the circumstance that that issue had neither been briefed nor argued by the parties. Mr. Justice Harlan felt that that issue was not ripe for disposition and hence that an opinion thereon was premature (at 502 n. 18, 84 S.Ct. at 1540).

fringement occurred, rather than profits and damages." H.R.Rep. No.1587, 79th Cong., 2d Sess. (1946), to accompany H.R.5311, at 1–2; S.Rep.No.1503, 79th Cong., 2d Sess. (1946), to accompany H.R.5311, at 2.

There can be no doubt that the amendment succeeded in effectuating this purpose; *it is clear that under the present statute only damages are recoverable.* See, e. g., Ric-Wil Co. v. E. B. Kaiser Co., 179 F.2d 401, 407 (C.A.7th Cir. 1950), cert. denied, 339 U.S. 958, 70 S.Ct. 981, 94 L.Ed. 1369; Livesay Window Co. v. Livesay Industries, Inc., 251 F.2d 469, 471–472 (C.A.5th Cir. 1958); Laskowitz v. Marie Designer, Inc., 119 F.Supp. 541, 554–555 (D.C.S.D. Cal.1954); Cullen, 28 J.Pat.Off.Soc. 838 (1946); Wolff, 28 J.Pat.Off.Soc. 877 (1946).

The 1946 amendment is of crucial significance to the total amount of CTR's recovery against Aro and hence to the amount, if any, that may still be recovered after receipt of the payment from Ford. When recovery of the infringer's profits as such was allowed, the rule was that "complainant's damages are no criterion of defendant's profits"; it was "immaterial that the profits made by the defendant would not have been made by the plaintiff." 3 Walker, Patents (Deller ed. 1937), § 845, at 2186. And in cases of joint infringement this Court was said to have declared the doctrine that, whereas "when the total damage sustained has been paid by one tortfeasor, the damages cannot be duplicated through a recovery against another," nevertheless, "every infringer of a patent right may be made to give up whatever profits he has derived from the infringement, and * * * one infringer is not relieved by payment by another infringer, but each is accountable for the profits which he has received." Hazeltine Corp. v. Atwater

Kent Mfg. Co., supra, 34 F.2d 50, 52. Under such a rule, CTR might well argue that the payment received from Ford could have no effect in preventing it from recovering the profits made by Aro—which might even exceed the amount of a royalty on Aro's sales.

*But the present statutory rule is that only "damages" may be recovered. These have been defined by this Court as "compensation for the pecuniary loss he [the patentee] has suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts."* Coupe v. Royer, 155 U.S. 565, 582, 15 S.Ct. 199, 206, 39 L.Ed. 263. *They have been said to constitute "the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred."* Yale Lock Mfg. Co. v. Sargent, 117 U.S. 536, 552, 6 S.Ct. 934, 942, 29 L.Ed. 954. *The question to be asked in determining damages is "how much had the Patent Holder and Licensee suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would Patent Holder-Licensee have made?"* Livesay Window Co. v. Livesay Industries, Inc., supra, 251 F.2d, at 471.

Thus, *to determine the damages that may be recovered from Aro here, we must ask how much CTR suffered by Aro's infringement—how much it would have made if Aro had not infringed.*

Answering the question just posed, the Court held that CTR's damages should not be measured by a royalty on Aro's sales because "CTR and AB were not deprived of such a royalty by Aro's infringement, for they could not have licensed Aro's sales in any event; they were denied the right to do so in Aro I, and would still be denied it even if they had received no royalties on the patented combinations themselves."

Mr. Justice Brennan continued:

This does not mean, of course, that CTR would have no remedy for Aro's contributory infringement. It could in a proper case obtain an injunction; it could recover such *damages as had actually been suffered* from the contributory infringement by virtue of the prolongation of the use of the infringing automobiles; it could in a case of willful or bad-faith infringement recover punitive or "increased" damages under the statute's trebling provision; and it could perhaps—we express no view on the question—recover from Aro a royalty on Ford's sales of the patented top-structures, even though such damages were primarily caused not by Aro's infringement but by Ford's, in a case where they could not be recovered from Ford or Ford's customers. It is difficult to conceive of any instance, however, in which *actual damages* could properly be based on a royalty on sales of an unpatented article used merely to repair the patented structure.

If CTR thus could not collect a royalty on Aro's sales in the absence of any payment from Ford, it surely cannot do so here after AB, in return for $73,000, has released Ford and Ford's customers from liability for the direct infringement to which Aro contributed. Are there indeed any *actual damages* that CTR can recover from Aro after receiving $73,-000 from Ford? The answer depends on *whether CTR and AB suffered any loss* by Aro's infringement—which depends in turn on *how much they would have made if Aro had not infringed.* \* \* \*

To allow recovery of a royalty on Aro's sales after receipt of the equivalent of a royalty on Ford's sales, or to allow any recovery from Aro after receipt of full satisfaction from Ford, would not only disregard *the statutory provision for recovery of "damages" only,* but would be at war with virtually every policy consideration in this area of the law. \* \* \* Whatever the result might have been under the old "damages and profits" provision, no such perversion of the congressional purpose is possible within *the rule allowing recovery of "damages" only.*

The views expressed by Mr. Justice Brennan in Aro II were decisively applied in Marvel Specialty Co. v. Bell Hosiery Mills, Inc., 235 F.Supp. 218 (W.D.N.C. 1964) by Chief Judge Craven who, in applying the measure of recovery defined in 35 U.S.C. § 284, said (at 219):

Sooner or later the court must determine the measure of damages. It ought to be determined now so that the Master can narrow the scope of his inquiry. Obviously the relevant facts vary considerably as the approach may vary from (1) damage to the patent holder to (2) profits gained by the infringers. Nothing is to be gained by having the Master ride off in both directions.

The problem would be much more difficult but for the recent decision in Aro Manufacturing Co. v. Convertible Top Replacement Co., 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964). The following language from the opinion is controlling here:

" 'In patent nomenclature what the infringer makes is "profits," what the owner of the patent loses by such infringement is "damages." '

Duplate Corp. v. Triplex Safety Glass Co., 298 U.S. 448, 451, 56 S.Ct. 792, 793, 80 L.Ed. 1274 [1278]. Profits and damages have traditionally been all-inclusive as the two basic elements of recovery. Prior to 1946, the statutory precursor of the present § 284 allowed recovery of both amounts, reading as follows:

" '[U]pon a decree being rendered in any such case for an infringement the complainant shall be entitled to recover, in addition to the profits to be accounted for

by the defendant, the damages the complainant has sustained thereby * * *." R.S. § 4921, as amended, 42 Stat. 392.

"By the 1946 amendment, Act of August 1, 1946, c. 726, § 1, 60 Stat. 778, 35 U.S.C. (1946 ed.), §§ 67, 70, the statute was changed to approximately its present form, whereby only 'damages' are recoverable. The purpose of the change was precisely to eliminate the recovery of profits as such and allow recovery of damages only.

" 'The object of the bill is to make the basis of recovery in patent-infringement suits general damages, that is, any damages the complainant can prove, not less than a reasonable royalty, together with interest from the time infringement occurred, rather than profits and damages.' H.R. Rep.No.1587, 79th Cong., 2d Sess. (1946), to accompany H.R.5311, at 1–2; S.Rep.No.1503, 79th Cong., 2d Sess. (1946), to accompany H.R.5311, at 2, U.S.Code Cong.Service 1946, p. 1387.

"There can be no doubt that the amendment succeeded in effectuating this purpose; it is clear that under the present statute only damages are recoverable." (Emphasis mine.)

In view of the foregoing, the court sustains GP's objection to the Special Master's use of GP's profits as the measuring-rod for USP's damages; and the court awards USP a reasonable royalty.

## THE QUESTION OF FURTHER PROCEEDINGS

In light of the views expressed in this opinion, the following interrelated questions remain for disposition: whether, on the present record, the court could or should proceed to fix the amount of the reasonable royalty; and whether any further proceedings (including proposed specific findings and conclusions) will bring this open item of a reasonable royalty most expeditiously to a final determination.

Upon the hearing of objections to the Report before this court, GP contended "that there is adequate testimony in this record" compelling the court to determine the amount of a reasonable royalty (Transcript of Argument at 181–182 (April 21, 1964)); and that, in so fixing a reasonable royalty, the court "could" and "should" consider GP's profits (Transcript of Argument at 174 (April 21, 1964)).

However, GP has not explicitly and specifically stated how, in terms of percentage or otherwise, the court should so consider GP's profits in fixing a reasonable royalty. GP's main brief (at 95) asks that "this court should make its own findings of fact and conclusions of law upon the evidence contained in the record." And the same position is expressed by GP in the concluding unnumbered paragraph of its objections (at 4) to the Report. It is to be noted, however, that GP's main brief (at 51–56) summarizes what it contends are the criteria and the record evidence herein for determining the amount of a reasonable royalty.

Furthermore, it would appear that USP has given no factual consideration to the amount of a reasonable royalty, resting exclusively thus far on the legal proposition that a reasonable royalty is not the proper measure of recovery herein. Thus, USP's briefs have not dealt with the criteria and evidence relating to the amount of a reasonable royalty.

The amount of a reasonable royalty has not been argued before the court on April 21, 1964 when counsel were heard at length. Neither party has proposed findings and conclusions on that subject.

While the Report summarizes the record testimony relating to a reasonable royalty, it does not recommend a royalty in any amount for the reason that it adopts a different measure of recovery.

Consequently, these and other related matters, if any, should be given whatever consideration is necessary or appropriate

at a hearing (Fed.R.Civ.P. 53(e) (2)) to be held within ten days after the date of the filing of this opinion.

The parties' respective objections are disposed of in accordance with the views expressed in this opinion.

So ordered.